The reporter states, in a note on page 607, that all the cases of practice reported, of which this was one, were decided with the sanction of two, at least, and nearly all with that of three or more, of the justices of the supreme court, as it was constituted in 1853; so that the decision of Judge Bosworth stands for something more than the opinion of a single judge.    The question came up again in 1859, before Judge Ingraham, in Wellington v. Claason, 9 Abb. Prac. 175, and he expressed his entire concurrence with the opinion of Judge Bosworth; holding that under the Code, as well as under the former practice, where several defendants were included in an action on contract, any one not served might, against the plaintiff's objection, enter a voluntary appearance.    These decisions were made under the last sentence of section 139 of the Code of Procedure, which has been copied into the Code of Civil Procedure as section 424, and are, in my opinion, decisive of the present motion.    The plaintiffs appeal to section 1932 of the Code as affording a discretionary power to the court to deny this motion.    I do not so construe it.    That section provides that:

"In an action, wherein the complaint demands judgment for a sum of money against two or more defendants, alleged to be jointly indebted upon contract, if the summons is served upon one or more, but not upon all of the defendants, the plaintiff may proceed against the defendant or defendants, upon whom it is served, unless the court otherwise directs."

This section must be read in the light of section 424, which provides that "the voluntary appearance of a defendant is equivalent to personal service of the summons upon him"; so that what section 1932 really provides is that, in a case therein provided for, a plaintiff may proceed against a defendant or defendants upon whom the summons has been served, or who have voluntarily appeared, and the power reserved to the court is not to authorize procedure against those defendants alone who have been served with summons; for the section itself does that, in the absence of any direction from the court.    What is really reserved to the court is the power to "otherwise direct"; that is, when justice so requires, to forbid the plaintiff to proceed against those defendants upon whom alone he had seen fit to make service.

The motion must be granted, with $10 costs.

Motion granted, with $10 costs.

---

(26 Misc. Rep. 613.)

LEWISOHN et al. v. ANACONDA COPPER–MIN. CO. et al.

(Supreme Court, Special Term, New York County.    March 15, 1899.)

1. FOREIGN CORPORATIONS—RIGHT TO VOTE STOCK—CONFLICT OF LAWS.

The question of the right of a person in whose name stock in a Montana corporation has been registered that he may act as trustee and agent for the owners thereof, to whom he subsequently transfers it, to vote at stockholders' meetings, under the statutes of Montana, is for determination of the courts of that state; and the courts of New York will not enjoin such person from voting such stock, on the ground that the statutes of Montana forbid it, in the absence of a decision on the question by the courts of the latter state.

**2. RIGHTS OF MINORITY STOCKHOLDERS—MOTIVE.**

A bona fide minority stockholder in a substantial amount is not precluded from enjoining the majority stockholders from voting to make a certain disposition of corporate property merely because his principal motive is to protect another corporation and his interests therein.

**3. SAME—SPECIAL INJURY.**

Minority stockholders cannot, as such, maintain a suit against the majority to enjoin a proposed sale of corporate property, on the ground of injury to stock, since the threatened damage is not personal or peculiar to the minority.

**4. SAME—SUITS IN BEHALF OF CORPORATION.**

Minority stockholders cannot maintain a suit against the majority to enjoin a proposed sale of corporate property, on the theory that it is a suit of the corporation itself, brought in their name, because of the refusal or neglect of the directors to bring it in the name of the corporation, where the majority are not acting in bad faith, or have not combined to take action to the injury of the minority.

**5. SAME—BURDEN OF PROOF.**

The burden is on the minority to show bad faith or a combination on the part of the majority to assume control to the injury of the minority.

**6. SALES OF CORPORATE PROPERTY—FRAUD.**

While it is ordinarily the duty of directors or stockholders in selling corporate property to accept the highest bid, a failure to do so does not warrant the inference of bad faith, as a matter of law.

**7. EQUITY—MULTIPLICITY OF SUITS—CORPORATIONS.**

In a suit by minority stockholders to enjoin the majority from voting for a sale of corporate property to one of two rival corporations, the court will not be influenced by the fact that a refusal to permit such sale will prevent a multiplicity of suits between such corporations, where neither is a party.

**8. INJUNCTION—RIGHT TO REMEDY—CORPORATIONS.**

A minority stockholder in a foreign corporation, suing to enjoin the majority from making an alleged illegal disposition of corporate property in the foreign state, does not show a right to equitable relief by injunction, free from reasonable doubt, where, if the sale is illegal, the courts of such state will afford a remedy by injunction, or an action against the majority stockholders, and the majority are amply responsible.

Action by Lewisohn Bros., suing on their own behalf and for all others similarly situated, against the Anaconda Copper-Mining Company and others, for an injunction. Complaint dismissed.

Guggenheimer, Untermyer & Marshall (Samuel Untermyer, Louis Marshall, and Benjamin N. Cardoza, of counsel), for plaintiffs.

Butler, Notman, Joline & Mynderse (Arthur H. Van Brunt, of counsel), for defendant Central Trust Co.

Alexander & Green (William C. Gulliver and Charles W. Pierson, of counsel), for defendants, except Central Trust Co.

Esek Cowen and Everett Masten, for defendant F. A. Heinze.

LAUGHLIN, J. This action is brought by minority stockholders in the Anaconda Copper-Mining Company, a Montana corporation, against the holders of record of all excepting a trifling amount of its capital stock, to enjoin the stockholders from voting to accept an offer made by F. A. Heinze for the purchase of two certain mining claims owned by the Anaconda Company; to enjoin the Central Trust Company from voting, by proxy or otherwise, on Anaconda stock registered

in its name; and to enjoin the Anaconda Company and its officers and agents from carrying out any directions of a stockholders' meeting for a sale of said claims otherwise than at public auction. The capital stock of the Anaconda Company issued and outstanding is $30,000,000, consisting of 1,200,000 shares, each of the par value of $25. The defendant Haggin is president of the company, and is the registered owner of 629,992 shares of the capital stock, but a small percentage of said stock is actually owned by the officers of the company. In 1895 two blocks of Anaconda stock, aggregating 570,000 shares, were purchased by an English syndicate known as the "Exploration Company of London," through their New York agents, Kuhn, Loeb & Co. In order that the stock might be sold and transferred in the London Stock Exchange without registration, and voted upon, and dividends collected in this country by a well-known, responsible party, it was agreed, as a condition of the purchase, that the shares should be registered in the name of the Central Trust Company, which should give a proxy to Kuhn, Loeb & Co., or, as they might direct, to vote thereon while the stock should remain registered in its name; and that Kuhn, Loeb & Co. should vote thereon as directed by the exploration company so long as they saw no impropriety in the instructions received. Accordingly, Kuhn, Loeb & Co. and the Central Trust Company made an agreement to that effect, and providing for the collection of dividends by the company for an agreed commission. The stock was issued to the Central Trust Company, which indorsed it in blank, and delivered it to Kuhn, Loeb & Co., who forwarded it to the exploration company. 566,400 of said shares still remain registered in the name of said trust company, pursuant to said plan; but they have been transferred and retransferred, and an amount equal to about one-fourth of the entire capital stock of the Anaconda Company is now held by unknown owners throughout Europe. The plaintiff is a New York corporation, and it owns 5,000 shares of the Anaconda stock so originally registered in the name of the trust company. The by-laws of the Anaconda Company prohibited the transfer of stock upon its books within 10 days of a stockholders' meeting, but within such time it permitted the registration upon its books of the transfer of stock to the plaintiff. The plaintiff only presented for such registration one half of the stock belonging to it. The other half remains registered in the name of the trust company. The plaintiff claims to represent and control 10,000 additional shares of stock, some or all of which are registered in the name of the trust company.

The mining claims in question are small, irregular tracts of land, known as the Sullivan and Snowbird claims, and lie between lands owned by the Boston & Montana Copper & Silver Mining Company (which we will call the "Boston & Montana Company"), and the Montana Ore-Purchasing Company (which we will call the "Montana Company"), both Montana corporations. These companies are business rivals, and for some time have been, and still are, engaged in extensive litigations, and each is extremely hostile to the other. The Anaconda Company, although actively engaged in mining operations, in that section, for many years, has not developed these claims, and has con-

sidered, and still considers, it doubtful whether they have any intrinsic value, and, owing to their dimensions and location, they would be of little practical value to any purchaser excepting one of these two rival companies. The complaint alleges that they have no value excepting as a basis for litigation between the owners of adjoining mining properties. There is ore not exceeding $100,000 in value under the surface of the Sullivan claim, and the Boston & Montana Company contends that the apex of this vein is upon abutting lands owned by it, and so situate with respect thereto that, under its grants of extra lateral rights, and under the mining law, it owns and may lawfully extract this ore. The Anaconda Company has formally protested against the Boston & Montana Company following this vein under its lands; and, with these mining claims, it is also selling all claims for trespasses that may have been committed thereon. The officers of the Montana Company believe that this vein of ore apexes on the Sullivan claim, and that it connects with a vein apexing on abutting lands owned by their company. It does not satisfactorily appear, and is not yet definitely known, where the apex of this vein is, or who owns the ore. There is no ore of any value in the Snowbird claim. In the spring of 1897 the attention of the Anaconda Company was called to the question of disposing of the Sullivan and Snowbird claims by an inquiry for their purchase. The general manager of the Anaconda Company then caused inquiry to be made of the superintendent and general manager of the Boston & Montana Company as to whether the latter company was interested in the Sullivan claim, and whether it was of any value to their company. These officers stated that, from tests which they had made and prospecting which they had done, they did not consider the claim of any value, but that at some future time it might be of interest to their company to bond and prospect it. After receiving this information, the Anaconda Company opened negotiations with said Heinze, the president of the Montana Company, for a sale of the claims. He offered $50,000, which was declined, and then $75,000; and the director of the Anaconda Company who conducted the negotiations stated that, if Heinze would offer $100,000, he would use his influence with the directors to accept. Thereafter Heinze did offer $100,000, and the president of the Anaconda Company wired him that if he would give $100,000, and deposit the same with the company, a meeting of the stockholders would be called to consider it. Heinze then made a formal written proposition for the purchase of these claims, together with all claims for trespass thereon, for $100,000, and deposited the money as suggested. The president presented the offer to a meeting of the directors held in New York City on September 10, 1897, and recommended that it be accepted. The president, general manager, and directors deeming this the full value of the property, a resolution was adopted accepting the proposition so far as the board had authority to do so, and calling a special meeting of the stockholders for November 17, 1897, to consider it. The managing officers of the Boston & Montana Company had known of the negotiations for a sale of these claims to Heinze for some time before this directors' meeting, but no other offer had been made by that or any other com-

pany for their purchase.    A meeting of the stockholders was regularly called pursuant to such resolution.    On November 8th, one of the attorneys for the plaintiff submitted to the Anaconda Company, in the name of the plaintiff, a written offer of $150,000 for these claims, and an offer to bid that amount on a sale at public auction, and demanded a rescission or modification of the resolution, calling a meeting of the stockholders so as to provide for a sale at public auction or to the plaintiff.    Mr. Haggin was then en route from Butte, Mont., to San Francisco, and had instructed his proxy to adjourn the stockholders' meeting should a larger offer than Heinze's be presented. The plaintiff's offer was promptly wired to Haggin, but not received by him until November 12th.    The plaintiff is a large stockholder in, and the sole purchasing agent of, the Boston & Montana Company; and the president of the former company is a director of the latter. The plaintiff's offer was in fact made in behalf of the Boston & Montana Company, and was authorized by its president, who considered the claims of that value to the company as a protection against further expensive and protracted litigation which he and some of the directors believed would follow the acquisition of the claims by the rival company.    They did not consider the claims of any other value, and preferred that the Anaconda Company should continue to own the same.

The attorneys for the plaintiff are counsel for the Boston & Montana Company, and have been consulted by it with reference to the ownership of the ore under the Sullivan claim and the chances of litigation concerning the same.    This litigation has already cost the plaintiff $2,500; and there is no agreement or understanding that it is to be reimbursed by the Boston & Montana Company.    The plaintiff's proportion of the additional $50,000, if the same should be at once divided among the stockholders on all the stock it owns, controls, and represents, would be only $625.    At the close of the evidence, the defendant Haggin individually offered to pay the plaintiff this amount and the costs.    The action is in form in behalf of other stockholders, as well as the plaintiff, but no other stockholder has appeared or objected to the sale to Heinze.    The plaintiff could have accepted such offer, and could have discontinued this suit; but, of course, it was not obliged to do so.    Hirshfield v. Bopp, 157 N. Y. 166, 51 N. E. 997.

The plaintiff does not insist that this suit is brought solely to protect its interests as a stockholder in the Anaconda Company. It frankly admits that a successful issue will result in a far greater protection of its interests as a stockholder in the Boston & Montana Company, and will benefit it as such sales agent.    The statute requires that stockholders' meetings be held in Montana; and the stockholders met pursuant to said call at Anaconda, Mont., on November 17, 1897.    Mr. Marshall, one of the plaintiff's attorneys, was present, and, on being given a hearing, stated that an injunction had been granted by Judge Knowles, of the United States circuit court, in Montana, and also by Justice Lawrence, of the supreme court of New York, which restrained action on the resolution of the directors and on Heinze's proposition, and that he had a copy of

plaintiff's offer, and a bond executed by it, conditioned that, if the Anaconda Company would sell these claims at public auction any time prior to January 1, 1898, it would make a cash bid therefor of $150,000. A majority, but not two-thirds, of the stock, was represented at such meeting. The plaintiff's offer has not been rejected or acted upon by the directors or stockholders otherwise than as hereinbefore stated. The directors of the Anaconda Company applied for a modification of the injunction order issued by Justice Lawrence, so as to permit the stockholders to vote on Heinze's offer; but their motion was denied by Justice Daly (23 Misc. Rep. 31, 50 N. Y. Supp. 263), on condition that plaintiff deposit with a trust company the amount of its promised bid as security for the performance of its offer contained in the complaint, to purchase the claims for that amount, or bid that sum therefor on a public sale. The plaintiff complied with the order, the money being furnished by the Boston & Montana Company. Counsel for the Montana Company and for Mr. Heinze, who are not parties to the suit, took part in the trial, and submitted a brief. The Central Trust Company has, at the request of Kuhn, Loeb & Co., issued a proxy to the secretary of the Anaconda Company to vote on the stock registered in its name, and Kuhn, Loeb & Co. have instructed him to vote on such stock in favor of accepting Heinze's bid; but said Trust Company, before said stockholders' meeting, offered to instruct its proxy to vote as the plaintiff might direct on all stock owned, represented, or controlled by the plaintiff, and registered in its name; and the Anaconda Company gave ample opportunity for the registration of such stock in the name of the owner. There is no evidence (unless it can be inferred from the facts stated) that any of the officers or stockholders of the Anaconda Company are interested in the Montana Company, or with Mr. Heinze, or are to be benefited by a sale of these claims to that company. Having had these negotiations with Heinze, and he having made this deposit of $100,000 with them, which they deem, and which is, as a matter of fact, the full, fair value of the property, they say that they feel obligated, as business men, to favor the acceptance of his proposition, if that may be lawfully done, notwithstanding the fact that this larger offer was subsequently presented before their negotiations had become binding in law. Some of the officers of the Anaconda Company unhesitatingly concede that it is immaterial to their company and its interests which of these rival companies obtains this property, and that they did in fact informally give the Boston & Montana Company the first opportunity to purchase.

It is sought to enjoin the Central Trust Company from voting on the stock registered in its name, on the ground that it has no beneficial interest in such stock. The statute of Montana requires that three-fourths of the capital stock shall be represented at a meeting to vote on a sale of such property, and an affirmative vote of two-thirds of the entire stock is necessary to authorize a sale. Unless the European holders are properly registered, probably these statutory requirements cannot be complied with. The Anaconda Company was incorporated on the 18th day of June, 1895. Section 455

of the Compiled Statutes of Montana, then in force, provided that the stock should be deemed personal property, and transferable in such manner as shall be prescribed by the by-laws. A by-law of the company provides that each stockholder shall be entitled to one vote for each share standing in his name on the books of the company. Sections 464 and 465 of the said Compiled Statutes authorized the holding of stock by trustees, and empowered them to vote on stock "in their hands." Section 471 provided that no transfer of stock, unless registered, should be valid for any purpose except to make the transferee liable for debts. On July 1, 1895, the Civil Code of Montana was enacted, and it provided that, to entitle a stockholder to vote in person or by proxy, he must be "a bona fide stockholder," having stock in his own name on books of the company 10 days. Other sections re-enacted the former provisions as to trustees. Section 401 of the Civil Code, as then enacted and as amended in 1897, provided that this Civil Code should not affect corporations theretofore formed, except where it was so expressly declared. These are the only statutes or by-laws to which our attention has been called as having any material bearing on the question of the right of the trust company to vote. The plaintiff contends that these provisions of the Civil Code, although enacted after its incorporation, are applicable to the Anaconda Company, and the defendants contend that they are not. No Montana decision in point is cited by either party. The Montana Code is a substantial re-enactment of the California Code. In Murphy v. Bank, 119 Cal. 334, 51 Pac. 317, it was held, under the section of the California Code from which section 401 of the Montana Code was copied, that the affairs of previously formed corporations were to be managed and conducted under the previously existing laws.

The plaintiff also contends that the provisions of law in force before the enactment of the Civil Code permitted only bona fide stockholders to vote. This the defendants contest. Thus, this court is called upon, without objection by either party, to determine, on conflicting claims, what statutory law of Montana regulates and defines the rights of stockholders of the Anaconda Company to vote at stockholders' meetings, and to then construe such law, and decree who may and who may not vote. Both the law and the course of business of the Anaconda Company, as shown by the evidence, gave the owners of the stock registered in the name of the trust company the right to terminate the trust, and have the stock registered in their own names on surrendering the stock. 1 Cook, Stock, Stockh. & Corp. Law, § 614; Woodruff v. Railroad Co., 19 Abb. N. C. 437, and note (s. c. 30 Fed. 91). The Central Trust Company became the registered owner of this stock for a lawful purpose, and it is acting in entire good faith. It is acting as trustee and agent for the owners, collecting their dividends, and deducting its commissions therefrom, and issuing proxies for voting on their stock. I am of opinion that so long as the subsequent purchasers omit to present their stock, and have it registered in their names upon the books of the company, or to object to the trust company voting thereon, they should be deemed to have acquiesced in the agreement by which their vendor

was to continue to collect dividends, and vote on the stock, and that, until such time, the Central Trust Company may lawfully represent them. Wilson v. Bridge, 9 R. I. 590; 1 Cook, Stock, Stockh. & Corp. Law, §§ 612–622; note on "Stock Trusts," 19 Abb. N. C. 448–454; Haines v. Railway Co., 33 App. Div. 156, 157, 53 N. Y. Supp. 368; Trust Co. v. Young, 6 U. S. App. 486, 4 C. C. A. 561, and 54 Fed. 759; In re Mohawk & H. R. Co., 19 Wend. 147.

But how can this court determine with certainty such questions of foreign law? The propositions are not free from doubt, and we have no Montana precedents. The courts of that state might follow our decision, even though they should not agree with our construction of their laws; and then, again, they might deem that the public policy of the state, or other considerations, required a different construction. The decision would have no binding effect in Montana, excepting between the parties; and neither Heinze nor his company is a party. We could only enforce our decree by contempt proceedings against any party within our jurisdiction who might violate it. The aid of the courts of Montana might be required to render the decision effectual. The questions presented relate to the internal affairs and management of a foreign corporation. They are questions of Montana law, and should be determined by the courts of that state.

In Kimball v. Railway Co., 157 Mass. 7, 31 N. E. 697, the court, considering a similar question, said:

"The plaintiff ought to resort, in the first instance, to that court which alone can declare the law of the case with authority, and can compel obedience to it by force. It would be a misuse of our powers to attempt to control the action of those courts in a case like this by an adjudication which would depend upon them for enforcement, and which they might say had mistaken the Missouri law."

In Madden v. Light Co., 181 Pa. St. 617, 37 Atl. 817 (an action by resident minority stockholders of a New Jersey corporation, whose plant and property were, however, all in Pennsylvania, to cancel a fraudulent contract which affected the value of their stock), the court, holding that the relief prayed for was matter of which the courts of Pennsylvania would not take jurisdiction, said:

"Its organization, corporate functions, who shall become members, are all questions for New Jersey courts, because questions of local law. Therefore they require local administration. * * * By the very act of membership, he intrusted his money to the control of an organization owing its existence to and governed by the laws of another state. * * * Without doubt, courts of equity in Pennsylvania have jurisdiction to enjoin unlawful acts by such corporations; to enforce performance of contracts in this state with third parties; in short, have general jurisdiction in equity, but they have no jurisdiction as to their internal management. * * * The existence of the wrong must be ascertained, and the remedy applied, according to the laws of the domicile."

In Mining Co. v. Field, 64 Md. 154, 20 Atl. 1039, the court say:

"Where the act complained of affects the complainant solely in his capacity as a member of the corporation, whether it be as stockholder, director, president, or other officer, and is the act of the corporation, whether acting in stockholders' meeting or through its agents, the board of directors, that then such action is the management of the internal affairs of the corporation, and, in case of a foreign corporation, our court will not take jurisdiction."

This statement of the law is quoted with approval in Madden Case, supra.

To the same effect are Gregory v. Railroad Co., 40 N. J. Eq. 44; Smith v. Insurance Co., 14 Allen, 343; Kansas & E. R. Const. Co. v. Topeka, S. & W. R. Co., 135 Mass. 39–41; Pierce v. Assurance Soc., 145 Mass. 63, 12 N. E. 858; 2 Cook, Stock, Stockh. & Corp. Law, § 684.

This rule has been recognized by the courts of our own state, and the propriety of a court of equity declining jurisdiction, even though it might exercise it, has been conceded.    Ives v. Smith (Sup.) 3 N. Y. Supp. 645, affirmed in (Sup.) 8 N. Y. Supp. 46; Delaware, L. & W. R. Co. v. New York, S. & W. R. Co., 12 Misc. Rep. 230, 33 N. Y. Supp. 1081.

These considerations lead to the conclusion that the Central Trust Company should not be enjoined by this court from voting on the stock registered in its name.    The plaintiff is now in a position to lay all the facts before the meeting of the stockholders; and if, under the law of Montana, the fact that the trust company has transferred the stock, deprives it of the right to vote, the plaintiff can object to its voting, and we cannot assume that the election officers will disregard their duty, and allow it to vote.    Should they do so, plaintiff will then be in a position to test the validity of the action taken.    Woodruff v. Railroad Co., 30 Fed. 91.

The objection that the refusal or neglect of the directors to bring the action has not been shown sufficiently to authorize its prosecution by a stockholder is, under the facts of this case, untenable.    It satisfactorily appears that such an application to the directors would have been futile.    Barr v. Railroad Co., 96 N. Y. 444–450; Gamble v. Water Co., 123 N. Y. 98, 99, 25 N. E. 201; Hawes v. Oakland, 104 U. S. 450.

Nor is there force in the objection that this action cannot be maintained because the plaintiff's principal motive and interest in prosecuting it is to protect the Boston & Montana Company and its interests in that company.    While this may be taken into consideration in determining whether a proper case for an injunction from the courts of this state is made out, yet it does not bar relief.    If the majority stockholders are violating any duty they owe to the minority remediable in a court of equity, the action is maintainable unless, on account of the plaintiff's motive or purpose in instituting and prosecuting the suit, the relief demanded may, if granted, work injustice to the defendants.    There is no claim that it would in this case.    The real inquiry is whether the plaintiff has interests entitled to the protection of the court, and not its ulterior motives and purposes in bringing the suit.    It is a bona fide stockholder in a substantial amount, and demands that its interests as such be protected.    This gives it a standing and entitles it to consideration.    Rice v. Rockefeller, 134 N. Y. 174, 31 N. E. 907; Ramsey v. Gould, 57 Barb. 398; Bloxam v. Railway Co., 3 Ch. App. 337–353; Mutter v. Railway Co., 38 Ch. Div. 96–104.

The remaining question is whether the plaintiff has established a cause of action for equitable relief against the majority stockholders of a foreign corporation.    The plaintiff, as a minority stockholder,

could not maintain an action at law or a suit in equity against the majority stockholders for its own benefit as such stockholder, or for the benefit of itself and other individual stockholders. In other words, it has no individual or personal right of action as a stockholder, either at law or in equity, on the ground of injury to stock. The threatened·damage is to the corporate property, and is not personal or peculiar to the minority stockholders. Gardiner v. Pollard, 10 Bosw. 674; Greaves v. Gouge, 16 Abb. Prac. (N. S.) 379, 52 How. Prac. 58, and 69 N. Y. 154; Allen v. Railroad Co., 49 How. Prac. 16; Allen v. Curtis, 26 Conn. 456; Conway v. Halsey, 44 N. J. Law, 462; De Neufville v. Railroad Co., 51 U. S. App. 378, 26 C. C. A. 306, and 81 Fed. 10; Porter v. Sabin, 149 U. S. 478, 13 Sup. Ct. 1008; Ritchie v. Mc-Mullen, 47 U. S. App. 494, 25 C. C. A. 50, and 79 Fed. 522; Bushby v. Bank, N. B. Eq. Cas. 62; 2 Cook, Stock, Stockh. & Corp. Law, § 701; 4 Thomp. Corp. §§ 4471–4477; 2 Pom. Eq. Jur. 1090, 1091, 1094, 1095.

The only theory, therefore, upon which the action can be maintained, if at all, is that it is an action by the corporation itself, brought in the name of the plaintiff, because of the refusal and neglect or manifest unwillingness of the directors to bring it in the name of the corporation. The grounds .upon which such an action can be maintained have been well stated in Hawes v. Oakland, 104 U. S. 450, and the doctrine there enunciated has been frequently quoted with approval by our court of appeals. In that case it was held that the plaintiff, to maintain such an action, must show—

"Some action or threatened action of the managing board of directors or trustees of the corporation, which is beyond the authority conferred on them by their charter or other source of organization; or such a fraudulent transaction completed or contemplated by the acting managers in connection with some other party or among themselves, or with other shareholders, as will result in serious injury to the corporation or to the interests of the other shareholders, or where the board of directors, or a majority of them, are acting for their own interest in a manner destructive of the corporation itself, or of the rights of the other shareholders."

The officers of a corporation have the fullest power and discretion to act upon their best judgment in managing and conducting the company's affairs within the scope of its charter; and mere errors of judgment are not sufficient to justify the interference of a court of equity. To warrant such intervention, it must be shown that the acts complained of were fraudulent or collusive and destructive of the rights of stockholders, or that the corporate powers have been illegally or unconscientiously executed, or that the personal interests of the directors are adverse to those of the stockholders. Leslie v. Lorillard, 110 N. Y. 519, 18 N. E. 363; Beveridge v. Railroad Co., 112 N. Y. 1, 19 N. E. 489; 4 Thomp. Corp. § 4533; 2 Cook, Stock, Stockh. & Corp. Law, § 484.

It was held in Ellerman v. Stockyards Co., 49 N. J. Eq. 217, 23 Atl. 287, that:

"Individual stockholders cannot question in judicial proceedings the corporate acts of directors, if the same are within the powers of the corporation, and in furtherance of its purposes, are not unlawful or against good morals, and are done in good faith, and in the exercise of an honest judgment. Questions of policy, of management, of expediency or contracts, of adequacy of consideration not grossly disproportionate, of lawful appropriation of cor-

porate funds to advance corporate interests, are left solely to the honest decision of the directors."

The directors of the Anaconda Company cannot be justly charged with fraud, bad faith, or even an error of judgment in adopting the resolution accepting Heinze's bid, which exceeded the value of the property, for at that time there was no other offer before them, and they had no reason to expect any other offer. There is no evidence that the majority stockholders are acting fraudulently or in bad faith, or that they have combined together to control the business to the injury of the minority; but it is contended by the plaintiff that they contemplate accepting Heinze's bid, and that the company will thereby sustain a loss of $50,000, which is a waste of corporate property that should be restrained by the court. The rule hereinbefore stated with reference to the authority of directors applies with greater force to the action of the majority stockholders in stockholders' meeting assembled. Generally speaking, "the resolution of the majority of the stockholders duly convened upon any question with which the company is legally competent to deal is binding upon the minority, and consequently upon the company; and every shareholder has a perfect right to vote upon any such question, although he may have a personal interest in the subject-matter, opposed to or different from the general or particular interest of the company." Transportation Co. v. Beatty, 12 App. Cas. 589.

The voting rights of shareholders in corporations, and the circumstances under which a trust relation exists between the majority and minority, have been clearly stated by the court of appeals in Gamble v. Water Co., 123 N. Y. 98, 99, 25 N. E. 201, 202. Judge Peckham, writing the opinion, in which all concurred, says:

"A shareholder has a legal right, at a meeting of the stockholders, to vote upon a measure, even though he has a personal interest therein separate from other shareholders. In such a meeting, each shareholder represents himself and his own interest solely; and he in no sense acts as a trustee or representative of others. The law of self-interest has at such time very great and proper sway. There can be little doubt, too, that at such meetings those who do vote upon their own stock vote upon it solely in the light of their own interest, or, at least, in what they conceive to be their own interest. Their action resulting from such votes must not be so detrimental to the interest of the corporation itself as to lead to the necessary inference that the interests of the majority of the stockholders lie wholly outside of and in opposition to the interests of the corporation and of the minority of the shareholders; and that their action is a wanton or fraudulent destruction of the rights of such minority. In such cases it may be stated that the action of the majority of the shareholders may be subjected to the scrutiny of a court of equity at the suit of the minority shareholders. * * * I think that where the action of the majority is plainly a fraud upon, or, in other words, is really oppressive to, the minority shareholders, and the directors or trustees have acted with and formed part of the majority, an action may be sustained by one of the minority shareholders suing in his own behalf, and in that of all others coming in, etc., to enjoin the action contemplated, and in which action the corporation should be made a party defendant. It is not, however, every question of mere administration or of policy in which there is a difference of opinion among the shareholders that enables the minority to claim that the action of the majority is oppressive, and which justifies the minority in coming to a court of equity to obtain relief. Generally, the rule must be that in such cases the will of the majority shall govern. The court would not be justified in interfering even in doubtful cases, where the action of the

majority might be susceptible of different constructions. To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint-stock association, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company, and in a manner inconsistent with its interests; otherwise, the court might be called upon to balance probabilities of profitable results to arise from the carrying out of the one or the other of different plans proposed by or on behalf of different shareholders in a corporation, and to decree the adoption of that line of policy which seemed to it to promise the best results, or at least to enjoin the carrying out of the opposite policy."

The holders of a majority of the capital stock of a corporation may ordinarily determine on the policy to be pursued (the Montana statute requires two-thirds) and direct and control the business of the company unrestrained. If they combine and assume the management and control, they owe a duty to the minority of good faith and diligence to carry out the purpose for which the corporation was organized, and they may not manage and conduct the business in their own interests, or to their own advantage, and to the injury of the other shareholders. Farmers' Loan & Trust Co. v. New York & N. R. Co., 150 N. Y. 410, 44 N. E. 1043; 2 Cook, Stock, Stockh. & Corp. Law, § 662.

The burden was upon the plaintiff to show facts sufficient to bring its case within these rules. In this, I think, the plaintiff has failed. The mere fact that the officers of the Anaconda Company now seem reluctant to vote against Heinze's offer, and to return his deposit, does not, under the circumstances, fairly warrant the inference that they are acting in bad faith, or are to derive any personal benefit from its acceptance, or that they are influenced by some ulterior motive or purpose. Ordinarily, it is the duty of directors or stockholders in selling corporate property to obtain the highest price. Farmers' Loan & Trust Co. v. New York & N. R. Co., 150 N. Y. 429, 44 N. E. 1043; Mason v. Mining Co., 25 Fed. 882; Forrester v. Mining Co. (Mont.) 55 Pac. 229. But it is manifest that such course might not always be for the best interests of the company. The honest judgment of those who have managed the corporation successfully, and on whose management its success in the future depends, and the wishes of those who own or represent the owners of nearly all the capital stock, are entitled to great weight in determining whether a court of equity should intervene. Beveridge v. Railroad Co., 112 N. Y. 1, 19 N. E. 489; Peabody v. Water Works (R. I.) 37 Atl. 807, 808. This property is of no practical value to the Anaconda Company. The higher offer arose solely from distrust of and hostility to Heinze and his company. Strictly speaking, the acceptance of Heinze's bid would not be waste of corporate property, for it exceeds the value of the property to be parted with. It is evident that those owning or representing considerably more than three-fourths of the capital stock will enter the stockholders' meeting favorably inclined towards Heinze's bid. They claim, and it is

a reasonable explanation of their attitude, that they are somewhat reluctant to take advantage of this feeling of distrust and hostility towards Heinze and his company, which prompts the Boston & Montana Company to offer more than the property is worth. To grant the injunction prayed for would be to control absolutely the votes of the stockholders, and deprive them of any discretion, and prevent their considering propositions and questions that may affect the interests or business standing of their company. So long as they act in good faith and within their authority, it is their province to consider these matters, and it would not be proper for this court to prevent their so doing. The power to transfer this real estate, and the mode and manner in which the same shall be exercised, are governed and controlled by the lex loci rei sitæ. If it be illegal under the Montana statutes, as construed by the courts of that state, for a corporation to sell to other than the highest bidder, or if that be waste, and such a sale would be a legal wrong to the corporation or its stockholders, an appropriate remedy will doubtless be found in the courts of that state by injunction, or an action in behalf of the corporation against those voting for such sale. The majority stockholders are amply responsible to repair any damages to the corporate interests for which they may become liable. It does not satisfactorily appear that irreparable damages will be sustained if an injunction be not granted.

I am unable to agree with the contention of the learned counsel for the plaintiff that, to prevent a multiplicity of suits between these rival companies, the court may, in this action to which neither is a party, be influenced by the fact that a sale to one would lessen while a sale to the other would increase litigation between them. The plaintiff does not show a right to equitable relief by injunction free from reasonable doubt, or a present necessity or fitness or serious exigency requiring interference by a court of equity foreign to the domicile of the corporation. Cumberland Coal & Iron Co. v. Hoffman Steam Coal Co., 30 Barb. 171; McHenry v. Jewett, 90 N. Y. 58; Atlantic & P. Tel. Co. v. Baltimore & O. R. Co., 46 N. Y. Super. Ct. 377–424.

Upon this statement of facts, with the reasons for my decision, and without making formal separate findings of fact and conclusions of law, I direct that judgment be entered dismissing the complaint, with costs.