PRESIDIO MINING CO. et al. v. OVERTON et al. *

(Circuit Court of Appeals, Ninth Circuit. October 27, 1919.)

No. 3253.

1. COURTS ⬤═══99(2)—DISMISSAL OF BILL AS LAW OF THE CASE.

Where the court sustains a motion to dismiss a bill for want of equity, with leave to amend, and the order is not appealed from, the insufficiency of the original bill is res judicata in subsequent proceedings in the case.

2. CORPORATIONS ⬤═══190—STOCKHOLDER'S SUIT AGAINST MAJORITY STOCKHOLDERS.

While a minority stockholder is entitled to the protection of a court of equity against illegal and fraudulent acts of the majority, the misconduct of the majority must be clearly established to justify the court in such interference, and the fact that, in a suit by a minority stockholder for such relief on behalf of himself and all others desiring to join, no other minority stockholders come in, may properly be considered.

3. CORPORATIONS ⬤═══320(11)—FRAUD OF MAJORITY STOCKHOLDERS.

Allegations of the bill of minority stockholders of a mining company that transactions by which a stockholder and director acquired ore land adjoining that of the company, which was leased to the company, were pursuant to a fraudulent agreement between the majority stockholders, and created a constructive trust in favor of the company, held not sustained by the evidence, which showed, on the contrary, that the transactions were legitimate and beneficial to the company.

4. CORPORATIONS ⬤═══320(11)—FRAUD OF MAJORITY STOCKHOLDERS.

Allegations of minority stockholders of a mining company that salaries of officers and directors, who constituted the majority stockholders, were excessive, and so maintained pursuant to a fraudulent agreement, held not sustained by evidence showing that salaries had been the same for many years prior to the alleged fraudulent agreement, and had subsequently been reduced.

5. CORPORATIONS ⬤═══316(2) — FRAUDULENT ACTS OF OFFICERS RAISING CONSTRUCTIVE TRUST.

The general manager of a mining company, who was also a director, in acquiring adjoining ore land, which he leased to the company, held not to have acted fraudulently, so as to create a constructive trust in favor of the company, but openly and fairly, by offering the company the benefit of his purchase, and by his purchase and lease enabling the company to continue its operation at a profit.

Appeal from the District Court of the United States for the Southern Division of the Northern District of California.

Suit by W. S. Overton and another, on behalf of themselves and other minority stockholders, against the Presidio Mining Company and others. Decree for complainants, and defendants appeal. Affirmed in part, and reversed in part.

The parties will be designated as in the court below.

This is an action brought in the lower court by W. S. Overton and Carl A. Martin, on behalf of themselves and other minority stockholders of the Presidio Mining Company, against the Presidio Mining Company and Wm. S. Noyes, B. S. Noyes, L. Osborn, John W. F. Peat, and L. M. Doherty, holding the majority of the stock of the corporation, to recover for the corporation:

(1) Certain mining property, known as section 5, block 8, containing 640 acres, more or less, located in Presidio county, state of Texas, acquired by Wm. S. Noyes, one of the defendants herein.

⬤═══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*For opinion on application for diminution of record, see 261 Fed. 1023, —— C. C. A. ——.
Rehearing granted April 5, 1920.

(2) Moneys paid on account of said section 5.

(3) Moneys alleged to have been stolen from the corporation by L. Osborn, one of the defendants.

(4) The return of excessive salaries paid officers of the corporation.

(5) Any and all other illegal profits made by Wm. S. Noyes and the other individual defendants from or through business with the corporation, directly or indirectly.

(6) For an accounting and judgment according to the equities thereupon appearing.

(7) For injunctive relief and a receivership.

R. T. Harding, Henry E. Monroe, and Harding & Monroe, all of San Francisco, Cal. (J. J. Dunne, of San Francisco, Cal., of counsel), for appellants.

Wm. F. Rose, of San Francisco, Cal. (Charles Clyde Spicer, of Los Angeles, Cal., of counsel), for appellees.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The Presidio Mining Company, named as one of the defendants herein, is a California corporation, incorporated under the laws of the state of California, with a capital of $150,000, divided into 150,000 shares of stock, of the par value of $1 each. The corporation has its home office in San Francisco. It owns and operates a lead-silver mine, comprising section 8, in Shafter, Presidio county, Tex.

The board of directors of the Presidio Mining Company, at the time of the commencement of this action, July 26, 1915, consisted of the defendants Wm. S. Noyes, B. S. Noyes, L. Osborn, John W. F. Peat, and L. M. Doherty. B. S. Noyes was president; Wm. S. Noyes, vice president and general manager; L. Osborn, secretary and treasurer.

Two of the defendants, Wm. S. Noyes and L. Osborn, have been connected with the corporation defendant since its organization in 1883; Noyes having sole charge of the mining operations of said corporation at Shafter, Tex., residing there until 1901, since which time he has resided in Oakland, Cal., and Osborn, as secretary of the corporation, having charge of the San Francisco office of the company until 1913. John W. F. Peat was president of said corporation from 1907 to 1913, and then assistant secretary, and later treasurer.

In December, 1912, Wm. S. Noyes owned 1,382 shares of stock standing in his name on the books of the corporation. L. Osborn was the largest stockholder, with 57,213⅓ shares in his own name and 2,331½ shares as trustee. L. M. Doherty had, as agent of one India Scott Willis, 36,956⅔ shares, standing in her name. B. S. Noyes first became a stockholder in the early part of 1913. John W. F. Peat had 10 shares.

W. S. Overton, one of the plaintiffs herein, resides in Silver Spring, Md., and Carl A. Martin is a resident of the state of Kansas. Plaintiffs are the owners, respectively of 11,353 shares and 2,500 shares of the capital stock of the corporation.

The jurisdiction of the federal court is invoked on the ground of diverse citizenship. The original complaint was filed in the District Court July 26, 1915. It was there alleged that the plaintiff Wm. S.

Overton owned 11,353 shares of the capital stock of the corporation; that Carl A. Martin, the other plaintiff, owned 2,500 shares; that certain other minority stockholders, named and alleged to be represented by the plaintiffs, owned 8,900 shares; but it does not appear that either Martin or the other minority stockholders has or have appeared or signified any wish to be made parties to the action. It was alleged that the defendants own and control 97,933½ shares of stock of the corporation; that the stock held by Wm. S. Noyes and L. M. Doherty, consisting of 87,833½ shares, has been pooled for voting purposes; that Noyes was elected a director, vice president, and general manager of the corporation January 31, 1913; that the majority interest represented by said stockholders had wholly dominated the affairs of the corporation at all meetings of the stockholders and board of directors thereof continuously for more than 2 years then last past; that Noyes was the principal single individual dominating said majority interest.

It was further alleged that the Presidio Mining Company was the owner of certain mining property situated in Presidio county, state of Texas, designated as section 8, containing 640 acres, together with certain appurtenances and improvements, including shafts, drifts, crosscuts, stopes, tramways, tracks, cars, mill, milling machinery, and reduction works for the mining, milling, handling, and treatment of ores, etc.; that the defendant Wm. S. Noyes had been continuously for approximately 2 years then last past the record owner of section 5, containing 640 acres, more or less, adjoining and adjacent to section 8, owned by the defendant the Presidio Mining Company.

It was alleged in substance that plaintiffs had been informed within two years then last past by the officers of the Presidio Mining Company that the company's mine in section 8 was almost worked out and could not produce enough ore of sufficient high grade to successfully operate the reduction plant on said section 8 at a profit; that it was necessary that section 5 be operated in connection with section 8, and by and through said defendant Wm. S. Noyes, for the purpose of producing high-grade ore to mix with the ores mined from section 8, and thereby keep the reduction works and cyanide plant in operation at a profit to the company.

The plaintiffs alleged on information and belief that without said section 5 and the ores produced therefrom said mine and mill of the Presidio Mining Company would have had to cease operations; that said section 5 was the only property sufficiently near and accessible to section 8 from which to obtain a sufficient quantity of high-grade ore; that, well knowing all the foregoing facts, the directors of the corporation expended for improvements on the mill and milling plant of the corporation the sum of approximately $100,000 within the 2½ years then last past without attempting to secure said section 5, and said directors willfully allowed, in derogation of the rights of the plaintiffs and the minority interest in said corporation, said Wm. S. Noyes to obtain the same from the Silver Hill Mill & Mining Company in the manner and for the purposes set forth in the complaint; that said Noyes had personally for his own interest, and in derogation of the rights of plaintiffs, made large sums of money from his transactions

in connection with said section 5 and otherwise with the Presidio Mining Company, while conducting its affairs as its manager and director thereof; that he had secured to himself the said section 5, well knowing that in equity and good conscience the said section 5 should have been purchased by and transferred to the Presidio Mining Company.

It is alleged that said Wm. S. Noyes had been the record owner of said section 5 for more than 2 years prior to the commencement of the suit; that said ownership had been acquired by him by means of certain transactions between the said Noyes and the Presidio Mining Company, involving, among other things, the leasing of said section 5 to the Presidio Mining Company.

The transactions set forth in the complaint include, among other things, an agreement dated January 25, 1913, wherein the Silver Hill Mill & Mining Company leased to the Presidio Mining Company for the term of one year the tract of land described as section 5, with the right to enter upon said land for the purpose of working, mining, and extracting silver-bearing ores and other minerals that might be found therein. The consideration for this lease was the payment by the lessee to the lessor of 50 cents per ton for all ores taken from the mine. It was provided that the lease should terminate on 30 days' notice in writing, given by either party to the other party to the contract.

At a meeting of the board of directors of the Presidio Mining Company held February 15, 1913, all of the directors of the company named as defendants in this action being present, the following resolution was adopted:

"Whereas, at the request of this corporation, Wm. S. Noyes has expended large sums of money and has rendered valuable services to this corporation outside the lines of his employment, in negotiating and securing for this corporation that certain lease from the Silver Hill Mill & Mining Company to this corporation dated January 25, 1913, and set forth in these minutes on pages 28, 29, and 30, and will render further valuable services to this corporation by securing to this corporation a continuation of said lease, thereby securing large profits to this corporation: Be it therefore resolved that this corporation do pay said Wm. S. Noyes, as compensation for said services heretofore rendered and hereafter to be rendered, the sum of forty-five thousand ($45,000) dollars in the manner following, to wit: Eleven thousand ($11,000) dollars forthwith, the further sum of ten thousand ($10,000) dollars ninety days from this date, the further sum of twelve thousand ($12,000) dollars five months from date, and the further sum of twelve thousand ($12,000) dollars six months from date: Provided that, if the earnings of this corporation shall not be sufficient to make said deferred payments at the respective times above provided, then said deferred payments shall be made to said Noyes as fast as the earnings of this company will permit. The president and secretary are hereby authorized and directed to make the payments herein provided and to take receipts therefor as made."

The foregoing resolution is hereafter referred to as the "bonus resolution."

At a meeting of the board of directors of the corporation held November 19, 1913, the following resolution was adopted:

"Whereas, this corporation made and entered into a contract of lease with the Silver Hill Mill & Mining Company, bearing date the 25th day of January, 1913, and set forth in these minutes on pages 28 and 30; and whereas, by resolution adopted on the 15th day of February, 1913, and set forth in these min-

utes, pages 32 and 33, this board resolved to pay W. S. Noyes the sum of forty-five thousand ($45.000) dollars in the manner therein specified as a bonus or compensation for procuring said lease; and whereas, it was the intention of this board that by the arrangements above recited this corporation should make a large profit from the ores to be taken by it from the mine of said Silver Hill Mill & Mining Company, and that from such profit, and not from its other resources, this corporation should pay said bonus or compensation to said Noyes; and whereas, said Noyes offered to this corporation the opportunity to purchase said Silver Hill mine at the cost thereof, but this company was unable to purchase the same and declined to do so because of its financial inability, and in order to secure to this company the opportunity to make a profit from said mine the said Noyes thereafter purchased the entire capital stock of said Silver Hill Mill & Mining Company, and has caused said corporation to be dissolved and the said mine to be conveyed to him, but said Noyes declined to continue said lease, for the reason that the profit made by this company out of ores taken from said mine up to this date has been unduly large and unfair to said Noyes, and he now offers to enter into the lease set forth below."

In the lease referred to in the foregoing resolution it was provided that the Presidio Mining Company would at once enter upon section 5 for the purpose of working and extracting therefrom all silver-bearing ores and other minerals that might be found therein, and would pay to William S. Noyes one-half of the net value of any and all ores that had been or might be taken from said mine by the Presidio Mining Company and reducing in its mill, said net value to be determined as in the agreement provided, viz.: A record should be kept of the number of tons of ore taken by the Presidio Mining Company from section 5 and the average assays thereof in the stopes from which it is taken; a similar record should be kept of the ores taken by the Presidio Mining Company during the same period from its own mine (section 8), and from the two records so obtained and kept the average stope assays of all the ores milled from both of said mines for a given period should be reduced. After the ores had been milled the average extraction in fine ounces of silver should be ascertained, and the percentage of the average stope assays actually extracted should be calculated and determined, and the gross value of the ore taken during such period from section 5 should be deemed to be the average stope assay multiplied by the percentage of extraction. From such gross value the actual cost of mining and milling, less the sum of $1 per ton for the small cost of mining in section 5, as compared with the mine of the Presidio Mining Company (section 8), should be deducted, and the difference should constitute the net value of the ores taken during the period by the Presidio Mining Company from section 5. Freight, expressage, insurance, and refinery charges upon the bullion obtained from all such ores was to be treated as a part of the cost of reduction.

It was further provided that, in view of the large profit already made by the Presidio Mining Company from the ores theretofore taken from section 5, it was agreed that such sums as had been paid to Wm. S. Noyes under and by virtue of the resolution of February 15, 1913 (the bonus resolution), and all royalties (50 cents per ton) theretofore paid on account of the lease of January 25, 1913, from the Silver Hill Mill & Mining Company, should be retained by the

parties to whom they had been paid, and should be treated as a payment to Wm. S. Noyes on account of the proportion of net profits from said mine agreed to be paid by the Presidio Mining Company; it being the true intent of the agreement that an equal division of the net profits in the agreement specified would be a fair and just price to be paid Noyes for the ores so bought of him, the said Noyes furnishing the ores and the Presidio Mining Company reducing the same without the investment of any capital.

It was further agreed that the Presidio Mining Company would monthly render to Wm. S. Noyes a true and exact account of all ores extracted from said mine (section 5) during the preceding calendar month and a statement of the profit derived therefrom, and within 10 days after said account had been rendered would pay to Noyes the amount due him under the provisions of the agreement for the month for which the account had been rendered.

It was further agreed that all ores that had been taken out of the Silver Hill mine (section 5) by the Presidio Mining Company should be deemed to have been taken out under the provisions of the agreement then being made, and should be settled for by the Presidio Mining Company as provided in the contract, and the contract of lease by and between the Silver Hill Mill & Mining Company and the Presidio Mining Company, dated January 25, 1913, should be and the same was declared canceled, annulled, abrogated, and set aside. It was further provided that the agreement then being made should terminate on 30 days' notice given in writing from either party to the contract.

It was alleged upon information and belief that the corporation and its stockholders had been defrauded out of said section 5, and in addition thereto had suffered the loss of and had been pillaged in the sum of upwards of $150,000. The complainants asked for an injunction restraining and preventing the directors and officers of the corporation defendant from the commission of any or similar acts as in the complaint alleged, and from further carrying on the business of the corporation; that the salaries of the directors and officers be cut off, and they be restrained from collecting their salaries, pending the determination of the action, and from paying out money of the corporation on any account whatsoever; the defendants be restrained from selling their stock in the corporation; that the directors and officers of the corporation be removed from office; that Wm. S. Noyes be restrained from transferring title to section 5 to any person whatsoever, and that he be compelled to transfer said section 5 to the defendant, the Presidio Mining Company, upon such terms as equity might require; that an accounting be had and a receiver appointed to take charge of the property and affairs of the corporation and for restitution in the sum of $150,000.

Upon the filing of this complaint an application was made to the court by the plaintiffs' for the appointment of a receiver of the corporation and for an injunction pendente lite. These motions were met by the defendants by a motion to dismiss the bill of complaint. Upon the hearing of these motions before Judge Dooling, the court denied

the application for a receiver and for an injunction pendente lite; the court holding that the bill did not show that the property bought by the defendant Noyes was so bought with the money of the defendant Presidio Mining Company. Nor did it show that the lease between said defendants was not a profitable one for the mining company. Nor did it show that defendant Noyes was not the owner of the leased property, or that the defendant company had any legal or equitable interest therein. "The most that can be said of this bill," said the court, "is that it avers the payment of extravagant salaries to its officers."

[1] The motion to dismiss the bill was granted unless the plaintiffs within 20 days filed an amended bill stating a case for granting equitable relief. No application was made for a rehearing, and no appeal was taken from the decision. The insufficiency of the original complaint thereupon became res judicata in the subsequent proceedings before Judge Van Fleet. Cole Silver Mining Co. v. Virginia & Gold Hill Water Co., 1 Sawy. 685, 689, Fed. Cas. No. 2,990; Giant Powder Co. v. Cal. Vigotit Powder Co. (C. C.) 5 Fed. 198, 202; Preston v. Walsh (C. C.) 10 Fed. 316; Oglesby v. Attrill (C. C.) 14 Fed. 215; Reynolds v. Iron Silver Mining Co. (C. C.) 33 Fed. 354, 356; Shreve v. Cheesman, 69 Fed. 785, 790, 16 C. C. A. 413; Taylor v. Decatur M. & L. Co. (C. C.) 112 Fed. 449; Plattner Implement Co. v. International Harvester Co., 133 Fed. 376, 378, 66 C. C. A. 438; United States v. Rizzinelli (D. C.) 182 Fed. 675, 678; Aurora City v. West, 7 Wall. 82, 89, 19 L. Ed. 42. As said by Judge Field in the first-cited case:

"It would lead to unseemly conflicts, if the rulings of one judge upon a question of law should be disregarded, or be open to review by the other judge in the same case."

The questions involved in this appeal will, however, be determined upon their merits as they appear in the whole case, and not upon any technical rule of procedure. But we may properly inquire how far the insufficiency of the original complaint has been overcome by amendments, supplemental allegations, and proof. By this method we shall come to a clear understanding of the present controversy and how it has developed from the original complaint.

In an amended complaint filed September 25, 1915, it is alleged that the minority stockholders, specifically set forth in an exhibit attached to the complaint, were not made parties to the action stated in the amended complaint, for the reason that many of them were out of the jurisdiction of the court; that the redress and relief demanded by the plaintiffs were of common interest to the minority stockholders of the corporation; that the suit was brought by the plaintiffs for the benefit of the minority stockholders and for any who might desire to unite therein. The minority stockholders mentioned in the exhibit are represented as owning 29,313½ shares of stock, but as before stated they have not signified any wish to be made parties to the action or any desire to unite therein, and they are not named in the title of the amended complaint. We must therefore assume that they, together with the minority stockholders representing the 8,900 shares

mentioned in the body of the original complaint, have declined to be parties to the action or unite therein. Whether Carl A. Martin is properly a plaintiff on his own behalf we do not know. Nothing appears in the record from him to support such a claim, but for the present purpose it may be assumed, that he is properly named as a plaintiff in the case.

The arrangement of the stockholders of the corporation may then be classified as follows: The plaintiffs, W. S. Overton, holding 11,-353 shares and Carl A. Martin holding 2,500 shares. The defendant stockholders are Wm. S. Noyes, B. S. Noyes, L. Osborn, John W. F. Peat, and L. M. Doherty, holding, it is alleged, 97,933½ shares of the stock of the corporation. This leaves holdings amounting to 38,213½ shares not represented by any active participation in this action.

[2] We then have the plaintiffs holding 13,853 shares, the defendants holding 97,933½ shares, and certain minority stockholders, representing 38,213½ shares, who have not intervened in support of plaintiffs' cause of action, leaving the inference that they are not in accord with plaintiffs' complaint. Carson v. Allegany Window Glass Co. (C. C.) 189 Fed. 791, 804. As said by the Court of Chancery of New Jersey in Stokes v. Knickerbocker Ins. Co., 70 N. J. Eq. 518, 523, 61 Atl. 736, 738:

"This important fact [the nonintervention of a large number of stockholders] cannot be overlooked in determining the question whether the dissensions in the company have reached the point demanding interference. Such a contest as this, provoked by a minority of stockholders, would constantly arise if the court should say that the protest of every dissatisfied stockholder was a basis for such internal dissensions as to warrant a receivership."

The minority stockholder is entitled to the protection of a court of equity against the illegal and fraudulent acts of the majority; but the misconduct of the majority must be clearly established to justify the court in such interference. Here, as elsewhere, fraud is not presumed, but must be proved. Lewisohn v. Anaconda Copper Min. Co., 26 Misc. Rep. 613, 56 N. Y. Supp. 807, 818.

[3] The original complaint failed to state a case for granting equitable relief, first, because it did not appear that the property bought by the defendant Noyes (section 5) was bought with the money of the defendant Presidio Mining Company. In the amended complaint the transactions set out in the original complaint are restated, including the lease of January 25, 1913, wherein the Silver Hill Mill & Mining Company leased to the Presidio Mining Company section 5 for the term of one year, the so-called bonus resolution of February 15, 1913, and the lease of November 13, 1913. In the original complaint it was alleged that the majority interest had wholly dominated the affairs of the corporation, and that Noyes was the principal single individual dominating said majority interest. In the amended complaint it is alleged that the majority interest does not wholly dominate and control the officers of the corporation, but that Wm. S. Noyes is the principal single individual dominating said majority interest, and has at all times from about the middle of December, 1912, continuously

controlled, and still controls and dominates, the action of the majority stockholders. In a supplemental bill to the amended complaint, filed March 16, 1916, the purchase of section 5 by Noyes is set forth in the following terms:

"That in the latter part of 1912 defendant Wm. S. Noyes negotiated for and secured an option on all except four (4) shares of the 1,500 shares of capital stock of the Silver Hill Mill & Mining Company in Texas. That said Noyes, after securing the option to purchase said capital stock controlling section 5, and before paying anything therefor, went on and into said section 5 with E. M. Gleim, assistant to Wm. S. Noyes, and ascertained that there were from 10,000 to 20,000 tons of rich silver-lead ore immediately available, worth over $100,000. That, after computing the value of said ore, said Wm. S. Noyes borrowed the money to pay for the stock of the Silver Hill Mill & Mining Company then held by him under option. That he borrowed $10,000 from the Marfa National Bank, and gave as collateral security his stock of the Presidio Mining Company. That he borrowed $10,000 from one Benton Bowers, residing in Oregon, and gave his promissory note for $5,000 to Harry B. Young in the premises. That said Benton Bowers, although a resident of Oregon, sold at that time and does now sell supplies to the Presidio Mining Company, receiving $600 to $1,200 each month from said corporation therefor. (Complainants further aver that all supplies purchased at the mine are purchased without open competition.) That said Wm. S. Noyes, immediately on securing said stock of the Silver Hill Mill & Mining Company and the control of section 5, made a lease with the Presidio Mining Company, dated January 25, 1913, as set forth in the amended bill, marked Exhibit B."

In the course of the trial Wm. S. Noyes, testifying on behalf of the defendants, referred to the "bonus resolution," providing that the Presidio Mining Company pay him $45,000 for negotiating and securing leases for section 5, when the following proceedings took place:

"Mr. Harding (counsel for defendants): It may be stipulated that the total cost of section 5 to the defendant Wm. S. Noyes was $24,009.33?

"Mr. Rose (counsel for the plaintiffs): Yes.

"The Court: Does your stipulation go to the extent that Mr. Noyes paid that money out of his own pocket? Your claim is that it was the money of the corporation.

"Mr. Rose: Our claim is this—our whole contention is this: That Mr. Noyes borrowed the money and gave his personal notes, for instance, one for $10,000, another for $10,000, and another one for $5,000, and with that money he paid to the stockholders of the Silver Hill Mill & Mining Company the sum of $24,000; but that the notes themselves which he gave, from which these moneys were paid, were not paid until a year or a year and a half thereafter that particular period, and the moneys were taken from the corporation."

Were the moneys used to pay these Noyes notes taken from the treasury of the corporation? The evidence in the record is that it was not so taken. Mr. Noyes testified on this subject as follows:

"In the purchase of this stock [stock of the Silver Hill Mill & Mining Company] I borrowed $10,000 from Benton Bowers on January 7, 1913, and $10,000 from the Marfa National Bank. I gave my note in part payment to Henry Young for $5,000. I repaid the money that Benton Bowers loaned me on October 1, 1913, by drawing $6,000 from an account I had in New York, through J. Barth & Co. here, and drew my check out of my bank account here for the balance, with interest, $4,584.15. The loan from the Marfa National Bank of January 25th, I paid on the 19th of August, 1913, by a draft on the Anglo-London & Paris National Bank, on New York, to the order of B. S. Noyes, and indorsed to me. That was a loan I made from my brother, and I paid the Marfa National Bank loan. The note to Harry B. Young I paid by draft on Ashland, Or., for $5,000. It was another loan I made from Mr. Bow-

ers. The second loan from the Marfa National Bank I paid October 4th, by a telegraphic transfer from a sister of mine in New York, who had sold some property for me, and drafts for the balance from the Anglo here. Then those renewals of my brother I paid November 16, 1915. The one from Mr. Bowers, borrowed November 26, 1913, I repaid September 25, 1915."

The court, prosecuting further inquiry upon this subject, asked the witness Noyes:

"What note was that you paid with the funds you got from New York? A. The Benton Bowers note. In paying that note I got $6,000 of the funds from my banking house in New York, Herzog & Glacier. I went to J. Barth & Co. here, and asked them to get a telegraphic transfer from Herzog & Glacier; they got the telegraphic transfer from them and gave me a check on their bank here, which I have here—showing the source of that money—on the Bank of California. That telegraphic transfer was sent over their private wire; it was not the ordinary form of transfer.

"Mr. Harding: I offer this check in evidence.

"Mr. Rose: No objection.

"(Check introduced in evidence.)

"Mr. Harding: We will bring a witness from J. Barth & Co. here to show the transaction.

"Mr. Rose: We do not question this transaction. We admit the fact of this transfer of money in this manner."

This testimony stands uncontradicted, and shows beyond question that Noyes gave his notes in the first instance to secure the money and credit to buy the stock of the Silver Hill Mill & Mining Company, owning section 5, and that he subsequently paid these notes, not out of the funds of the corporation, but out of his own pocket, and this fact is finally and conclusively found by the court in the interlocutory decree, which, while it determines that Wm. S. Noyes is a trustee for said section 5 for the benefit of the Presidio Mining Company, provides that such title is—

"subject, however, to the payment of its purchase price of $24,009.33, and taxes or assessments paid by him on section 5, or other moneys properly paid by him on account of section 5, and that he be allowed interest on all of said sums from the date of payments made by him at the rate of 7 per cent. per annum."

If the money paid by Noyes for section 5 is to be refunded to him as directed by the interlocutory decree, it follows as a matter of course that the money was paid by Noyes out of his own funds, and not out of the funds of the corporation, nor out of any funds received from the corporation in any other than in a legitimate and proper business way. As we shall see later, he did receive payments for ores taken from section 5 and sold to the Presidio Mining Company, but no trust can be founded upon such transaction.

The second particular in which the original complaint failed to state a cause for equitable relief was the failure to show that the lease of section 5 by the Presidio Mining Company was not profitable for the company. In the amended complaint it is alleged that the leases of January 25, 1913, and November 19, 1913, were of no value to the Presidio Mining Company, and that the payment to Noyes of $45,-000 under the "bonus resolution" was exorbitant, excessive, illegal, and without any consideration whatever.

As the royalties paid to Noyes by the Presidio Mining Company under the lease of January 25, 1913, and all the payments made to him by the corporation under the so-called "bonus resolution" of February 15, 1913, were all taken up, merged, and accounted for in the lease of November 19, 1913, it follows that the questions to be determined must find their final solution under the terms of the lease of November 19, 1913, and not under the terms of the lease of January 25, 1913, or the terms of the so-called "bonus resolution" of February 15, 1913; that is to say, we must in the end measure the transactions of the parties for the whole period by the terms of the lease of November 19, 1913, and in view of all the surrounding circumstances. It therefore becomes necessary to inquire: What were the circumstances attending the dealings of the parties prior to November 19, 1913? Upon what terms did Noyes deliver ores from section 5 to the Presidio Mining Company during this time, as shown by the books of account kept by the company? The answer to this, and other questions of like character, was properly the work of an expert accountant, and it so appeared to the trial court, for during the hearing, and when the testimony on behalf of the defendants was approaching a conclusion, the court, of its own motion announced its purpose to designate a public accountant to examine the books of the company from 1906 down to the date of the hearing.

The court thereupon designated George T. Klink, of Klink, Bean & Co., certified public accountants of San Francisco, to make such an examination. The court stated that Mr. Klink was a very fair-minded man, and his results had always been satisfactory to the court, and as far as the observation of the court had gone such results were very close and very correct. The designation of Mr. Klink was accepted by the parties to the action, and the court thereupon directed that the accountant should be furnished with everything in the way of data that would enable him to determine as to the computation—the method and system of computation—under which payments had been made to Noyes for ore taken from section 5, whether such computation had been upon proper principles and calculated to produce correct results; that the accountant should examine the books, records, files, and vouchers of the Presidio Mining Company, and make a general audit of the same, commencing with April 18, 1906, to date, and report to the court the results of such examination. The court further directed that Mr. Klink should be notified that his appointment was by the direction of the court, and not by either side. In the order of the appointment the court directed that counsel for either of the parties to the action might direct the attention of the accountant to any special matters for examination they might desire. Accordingly, under the stipulation of the parties, more than 30 questions were submitted to the accountant by way of memoranda for investigation.

The accountant made the examination and reported as directed under the name of Klink, Bean & Co. To this report no exceptions were taken by either party. The report is in full in the record. It responds to all the directions of the court, and answers all the questions submitted to these official accountants by the stipulation of the parties.

It appears from this report that the following question was submitted to the accountants by the stipulation of the parties:

"The operating profit on ore taken from section 5 from January 1, 1913, to December 31, 1915."

In answer to this question the accountant reported:

"The operating profit on ore taken from section 5 from January 1, 1913, to December 31, 1915, is as follows (Schedule 5):

| | |
|---|---|
| 1913 ............................................... | $ 78,837.82 |
| 1914 ............................................... | 72,389.72 |
| 1915 ............................................... | 75,004.18 |
| | $226,231.72" |

By reference to Schedule 5 attached to the report, we find that it is a monthly detailed account, commencing with January and ending December 31, 1913, made to owners of section 5 under agreement of November, 1913. For the period immediately under consideration, commencing January 1, 1913, and ending October 31, 1913, the tons of ore mined from section 5 aggregated 5,030 tons, and the profit on that ore was $58,232.84. Under the terms of the lease of January 25, 1913, Noyes would have been entitled to receive for that ore only 50 cents per ton, or $2,515 on the 5,030 tons delivered from section 5, while the Presidio Mining Company was entitled to retain the entire profit, or $55,717.84 less $2,515 due Noyes, or a net of $53,502.84. The schedule, however, credits section 5, beginning with February, 1913, and ending October 31, 1913, with a 50 per cent. royalty, amounting to $29,889.20, on the net receipts, as provided in the lease of November 19, 1913, instead of 50 cents per ton, or $2,515, as provided in the lease of January 25, 1913; but if we add to this latter sum the amounts paid to Noyes under the "bonus resolution" of February 15, 1913, for ore delivered, amounting to $24,500, the total sum paid to Noyes was $27,-015, showing that the payments made to Noyes for ore delivered from section 5 from February, 1913, to October 31, 1913, was in accordance with the understanding subsequently incorporated into the lease of November 19, 1913.

But the point to be noted in this connection is not merely that the payments were so made, but that the payment of 50 cents per ton to Noyes for ore delivered from section 5, if he was to receive no other payments, was manifestly unfair and unjust to him, first, because it did not express the real agreement of the parties; and, second, because it had no just or proper relation to the actual value of the ore delivered. It follows that the recitals in the lease of November 19, 1913, concerning the terms of the lease of January 25, 1913, "that the profit made by the Presidio Mining Company out of the ores taken from section 5 up to that date had been unduly large and unfair to Noyes," were absolutely correct, if limited to the terms of that lease, and justified Noyes in terminating that lease, and the Presidio Mining Company in entering into a new lease, that would state the actual facts and correctly represent the rights of the parties thereto.

Turning again to the report of the official accountants, we find, in Schedule 4 attached to that report, that during the same period the

Presidio Mining Company took from its own mine (section 8) 8,987 tons of ore. The average net value per ton of all the ore mined by the Presidio Mining Company (section 8 and section 5) for the year 1913 is given as $11.156 per ton; that from section 8 is given as $7.7048 per ton, while that from section 5 is given as $18.574 per ton. The average operating cost per ton for all the ore milled by the Presidio Mining Company during that year is given as $8.952. The average value of a ton of ore taken from section 8 during the year was therefore $1.207 less per ton than the operating cost, while the average value of the ore taken from section 5 was $9.622 per ton in excess of the operating cost per ton. These values for the whole of the year 1913 may be applied approximately and for the present purpose to the period from January 25, 1913, to October 31, 1913. From these productions of ores and their values we are authorized to draw the following conclusions:

It was the mixing of the ores from section 5 with the ores from section 8 that made the mining and milling operations of the Presidio Mining Company profitable. Without such ores the operations of the company would have been unprofitable. The latter had a mill, but no ore in section 8 of sufficient value to make the working of the plant under the pan-amalgamation process profitable. Noyes had ore in section 5 of sufficient value, but he had no mill to reduce the ore, and the evidence was that the building of an independent mill for section 5 alone was not justified by the amount of ore in sight. The installation of the cyanide process in the Presidio plant, completed in July, 1913, made the operation of the plant more profitable after that time, but did not affect the comparative values of the ores taken from the two sections. What, then, could be more practicable and profitable than to bring these two properties together, by an arrangement or agreement such, as we find in the lease of November 19, 1913, wherein it was agreed that the Presidio Mining Company would pay Noyes one-half of the net value of all the ores taken from section 5? The advisability of bringing these two properties together is admitted by the plaintiffs, and is made the basis of this suit.

The failure in the second particular mentioned by Judge Dooling on the part of the plaintiffs to show a case for granting equitable relief under the original bill was because it did not appear that the lease of November 19, 1913, was not profitable. This defect in the amended complaint was overcome by allegations in the amended complaint that it was not profitable for the company, but it appears from the evidence that section 5 was so profitable, necessary, and advantageous to the company in working section 8 that it is claimed by plaintiffs and alleged in the amended complaint that Noyes was charged with the duties of purchasing section 5 for the company, and his failure to do so is alleged as fraud upon the company. As this alleged fraudulent feature of the transaction is the controlling question in issue in this case, and is mainly a question of fact, we will defer its consideration as a question of law until we have passed upon certain questions of fact relating to the good faith of Noyes in his dealings with the company.

The third ground of failure of the original bill to state a case for

equitable relief was that it did not show that Noyes was not the owner of section 5. That question has already been disposed of by the finding of the interlocutory decree and the proof that Noyes is and has been the owner of section 5 since May 26, 1913.

The fourth ground of failure of the original bill to state a cause for equitable relief was that it did not appear that the Presidio Mining Company had any legal or equitable interest in section 5.

The object of this suit is to establish a constructive trust in Noyes for the ownership of section 5 for the benefit of the Presidio Mining Company. The court below in its interlocutory decree found that Noyes purchased section 5 with his own money. We concur in that finding, to which we add a finding that the purchase was made after the Presidio Mining Company had refused to make the purchase because of its financial inability, as recited in the lease of November 19, 1913. But the plaintiffs charge Noyes with having acted in a fiduciary capacity in the purchase, because of his relation to the company as an officer and director, and that his action was fraudulent. It is further charged that he obtained the title in his own name through fraud, misrepresentation, and concealment, and that this fraud and concealment was participated in by the other officers and directors of the company and its majority stockholders. These allegations are denied by the defendants under oath. The court below found this charge to be true, and based its decree upon this finding.

The first matter to be considered in connection with this charge is the so-called "bonus resolution" of February 15, 1913, with respect to which the plaintiffs charge that the payment of the sum of $45,000 was exorbitant, excessive, illegal, and without any consideration whatever. The first observation to be made in considering this charge is that it is not true as to the amount or in a lack of consideration. The sum of $45,000 was never paid to Noyes under the resolution, and was never claimed by him, either directly or indirectly. There was paid to him, on account of ores delivered by him to the Presidio Mining Company, the following sums: February 24, 1913, $6,000; February 28, $5,000; March 18, $5,000; May 15, $1,000; September 6, $3,500; October 1, $3,000; October 14, $1,000—making a total of $24,500. The resolution specifically provided that these payments should be made out of the earnings of the corporation; but, if such earnings should not be sufficient, then they should be paid as fast as the earnings of the company would permit. As the immediate prospective earnings of the company were to be from ore taken from section 5, to be delivered to the company by Noyes, he was to be paid the moneys specified in the resolution only out of the receipts of the Presidio Mining Company from ores to be delivered to the company by him. No other source of payment was provided or available. B. S. Noyes, the president of the Presidio Mining Company from January 29, 1913, testified concerning this transaction as follows: He was asked by counsel:

"Q. I will direct your attention, Mr. Noyes, to the meeting of the board of directors, February 15, 1913, at which meeting there was a resolution passed authorizing a payment, for services rendered to William S. Noyes, of the sum of $45,000, $11,000 immediately, and other sums thereafter. I will ask you whether you can tell us the circumstances and facts leading up to the passage

of that resolution. A. There had been a discussion between William S. Noyes, Mr. Osborn, Mrs. Willis, Miss Doherty, and myself, stockholders of the company, as to the putting in of a cyanide plant, whether it could be done or not, and what disposition would be made of section 5, which Mr. William S. Noyes had bought. Mr. Noyes stated that the company could have section 5 at cost then or thereafter, and it was informally decided prior to the date of that meeting that the company could not take it, and the suggestion had been made and assented to by all parties that, as long as Mr. Noyes carried it, the company would work the ore and settle with him on a basis of one-half of the net. At that time, now coming to February 15th, the company had been in possession, and the terms provided for in that resolution of February 15 were a sort of guess at what one-half of the net would amount to during the period covered by the dates given in that resolution."

William S. Noyes testified, among other things, concerning the passage of the resolution, as follows:

"The company had agreed—that is, the directors of the company had agreed —with me that we should divide the net equally. We all thought it was better that they should have some authority for paying me. The conversations led up to that directors' meeting. We had conversations on several occasions; these conversations led up to the passing of the resolution.

"Q. On what basis, if any, was that basis of $45,000 arrived at? A. It was as close an estimate—it was an estimate of what the half of the net would probably amount to during the few succeeding months that it was intended to be in force."

In view of this and other evidence to the same effect of an understanding between Noyes and the directors of the Presidio Mining Company, had prior to February 15, 1913, that the net proceeds of the ore taken from section 5 should be divided equally between Noyes and the company, why was it the terms of the lease of January 25, 1913, were not then changed and made to conform to that understanding? The explanation is given in the evidence relating to the situation of affairs at that time of the Silver Hill Mill & Mining Company, the owner of section 5. That corporation had no mill; the mine had been shut down since 1897. Noyes was familiar with the mine, and had been its superintendent. In November, 1912, he learned that section 5 was for sale. The engineers for Lewisohn Bros., a firm of New York operators, had turned it down after some work of exploration, mainly because the corporation had no mill. Noyes visited the mine with E. M. Gleim, the superintendent of the Presidio mine, in the last days of December, 1912. They examined the ore body, and found that the engineers for the New York people had run two drifts and opened up an ore deposit that was not known when Noyes was last in the mine. The ore exposure was about 80 feet in the drifts, 50 or 60 feet in a crosscut, and 30 feet in a winze.

Noyes made a rough guess that this deposit might contain 10,000 or 20,000 tons of ore. By the pan-amalgamation process then in operation at the Presidio mine, he estimated a profit of $10,000. But by the cyanide process, which he proposed to install at that mine, he estimated the profit from that ore at $50,000. He immediately took up options which he had previously secured on 1,244 shares of the Silver Hill Mill & Mining Company stock and purchased the same. The corporation had outstanding 1,500 shares of stock. This purchase by Noyes left 256 shares outstanding in other parties. One W.

L. Lane, of Houston, Tex., owned 188 shares, and friends of Lane owned 64 other shares, making 252 shares, leaving 4 shares which Noyes at that time had not located. Noyes secured a verbal agreement with Lane for the purchase of the 252 shares standing in his own name and in the name of his friends.

Lane had also an interest in the ore of section 5, other than his stock interest. This interest was a reservation of 5 per. cent. of all. the ore, oil, or mineral that might be taken from section 5. It was Noyes' purpose to secure all the shares of stock of the company, the Lane 5 per cent. interest in the ore of the mine, and discharge all obligations of the company—secure a transfer of section 5 to himself, including the Lane 5 per cent. interest in the ore, and dissolve the corporation. His explanation of this transaction is given in his testimony as follows:

"At that time I had bought and paid for 1,244 shares of the stock. I had a verbal promise from Mr. Lane to trade with me for 252 shares more, 188 of which belonged to him, and 64 to some of his friends; but I had nothing but this verbal promise. There were also 4 shares out that I could not find, and without them all I could not dissolve the corporation. I did not want to make a contract which might induce these people to go back on their word with me, or put the price to an unreasonable figure. I knew that whatever they asked me I would have to pay, so I told the directors I could not deal with them in an individual capacity, and to let the other stand until I should be able to dissolve the corporation. These other parties had given me a verbal assurance to deal with me upon a certain price at that time—all but 4 shares. Mr. Lane had said: 'I will trade with you the next time I come up here; I cannot do it now, as I have to leave.' They had not named any price. I made an offer, the same as I made the others, $13 and some cents a share."

The corporation had five directors. Lane was a director. Noyes put in the other four, and the mine was operated in accordance with the understanding with the directors of the Presidio Mining Company. Noyes finally secured the Lane stock and that of his friends, also Lane's 5 per cent. interest in the ore in section 5 and the four other shares of the outstanding stock of the company. The obligations of the corporation were thereupon discharged, section 5 transferred to Noyes, and the corporation dissolved; but this was not fully accomplished until May 26, 1913. It was to bridge this period required to secure all the stock and outstanding interests in the Silver Hill Mill & Mining Company, and the necessary change in the legal ownership of section 5, that the resolution of February 15, 1913, was adopted.

The testimony of Wm. S. Noyes upon this feature of the transaction was as follows:

"The bonus resolution of February 15th was drawn by Mr. McLeod, an attorney in the Mills Building. My brother overlooked it; I think it was at the suggestion of the board members. I had told them that I would like to draw more money under that verbal understanding than I was; that I ought to have one-half of the net; that as I could not make the contract individually—that is, I could not lease section 5 to them until I could dissolve the corporation—there would have to be some means devised. I put that in the hands of counsel, and that was their product."

As stated elsewhere in the evidence, it was a temporary arrangement to accomplish a temporary purpose. That the ore exposed in section 5 was a sufficient security for the payments to be made to Noyes un-

der the resolution appears from the testimony of E. M. Gleim, the superintendent of the Presidio Mining Company. He testified:

That he had charge of section 5 on behalf of the Presidio Mining Company during "January, February, March, and April, 1913; * * * that the gross value of the ore according to the assays delivered to the Presidio Mining Company at the end of February, 1913, was $41,474.92"; that they "recovered about 59 per cent. of the amount of the assays," making a "gross value of $24,470," from which should be deducted the "operating expenses," which he did not state; but he did state that the "ore body contained a considerable amount of lead sulphide, some of which could be sorted out, all that they could, and kept it on hand waiting for the cyanide plant to start, rather than ship it to the smelter at El Paso. It was finally worked by the cyanide plant; * * * it would have paid to ship it to El Paso; * * * it was a very high grade sulphide."

He testified further that section 5 "furnished the high grade ore with which to grade up the low grade ore from section 8." This testimony establishes beyond question that the acquisition of ore from section 5 was highly advantageous to the Presidio Mining Company; that the situation called for prompt action, and that it was the object of the resolution of February 15, 1913, to secure this high grade ore without waiting for the delay and possible complications incident to the purchase of all the stock and interests in the corporation and a change of title from a corporation to an individual. In other words, under the terms of this resolution Noyes gave the Presidio Mining Company the immediate benefit of his ownership of nearly all the stock of the corporation owning section 5. The security of the Presidio Mining Company for the agreement was ample, and rested in the fact that the payments were to be made out of the earnings of the company, and from no other source; that the ore already exposed and broken down was of a high grade, was in sight and available for delivery, to enable the company to make the payments at the dates mentioned in the resolution.

But there appears to have been a still further consideration for the resolution. In the fall of 1912 the Presidio Mining Company had a large reserve of ore running 14 to 16 ounces, but that ore could not be worked by the pan-amalgamation process, and the company faced the situation of putting in a cyanide plant or being compelled to abandon the mine. Noyes consulted the other owners and holders of the 97,000 shares of stock of the company in regard to the installation of a cyanide plant. They said they would like to see him do it, but without an assessment; that they were unable to pay an assessment. They suggested that Noyes make an estimate of the cost, and then see if he could not borrow the money from his friends. He went down to the mine, to look over the situation and see what could be done. He supposed there was $15,000 or $17,000 in the treasury of the company in San Francisco, which, with the bullion in transit, he estimated the assets of the company would be about $27,000. Deducting the December bills, amounting to about $16,000, he estimated that there was a balance in the treasury of about $11,000 or $12,000; but to make certain in making up his estimates he telegraphed from the mine in Texas to his brother, B. S. Noyes, in San Francisco, to ascertain the actual available cash in the treasury of the company. Mr. Osborn, the secretary

and treasurer of the company, reported that there was about $5,000 in the treasury. This report was sent to Wm. S. Noyes, who suspected at once that there was something wrong in Osborn's accounts. Further investigation resulted in the discovery that there was a shortage, amounting to $10,689.75. Wm. S. Noyes was so notified, and he returned to San Francisco. He notified one of the principal stockholders that he could not go on with the business unless this shortage was made good.

As a result of conferences with the directors and principal stockholders, Noyes agreed to loan Osborn the money to make good his shortage, and this he subsequently did out of the first two payments received from the company under the resolution of February 15, 1913. The result was that $10,689.75 of the $11,000 first paid to Noyes for ore from section 5 went immediately back into the treasury of the company, and Noyes proceeded with the work of installing the cyanide plant for the company. The effect of these transactions upon the affairs of the company was involved in a suggestion submitted to the official accountants, Klink, Bean & Co., as follows:

"State whether, in your opinion, a contract in the terms of the contract dated November 19, 1913 (Exhibit A), was or was not a fair and judicious contract for the board of directors of said Presidio Mining Company to make in January or February, 1913.

"State whether the arrangement that was made between the defendant William S. Noyes and the Presidio Mining Company in that regard has resulted in benefit or detriment to said Presidio Mining Company, and to what extent."

To these questions the accountants replied as follows:

"Assuming that the company could not avail itself of the opportunity to acquire the property now known as section 5, the contract of November 19, 1913, was fair enough. Should its operation have proven unprofitable, it could have been terminated on 30 days' notice. * * * We * * * are under the impression that the undertaking by the company to pay $45,000 for securing the lease was neither judicious nor equitable. * * *

"Although the payment of $45,000 appears to us as excessive, the arrangement has, on the whole, resulted in a benefit to the company. There has been a steady reduction in average yield per ton from section 8, at which yield it would have been impossible to continue operations for any great length of time, and the mixture of high grade ore from section 5 has been essential and necessary."

Harry J. Cooper, in the employ of Klink, Bean & Co., as the principal of the auditing department of the accountants, testified that he made the computations and tabulations in their report. He was asked, if in answering the question No. 26 he had in mind that the $45,000 was ultimately paid out of the profits of section 5. His answer was:

"I took the bare facts that at the meeting of the board of directors this $45,000 was voted. Whether or not it was paid, I did not take into consideration at the time; but I did state that the undertaking of the company to pay it, at the time the resolution appropriating this $45,000 was passed, this contract for the 50 per cent. division was not in existence.

"Q. What did you find to be the facts with regard to whether or not that $45,000 was paid? How much of it, if any, was paid? A. Eventually, I guess, it was all paid out of the division of the 50 per cent. to each party; but I think that of that the sum of $24,800 was paid before this agreement for the 50 per cent. division; that is just my recollection.

"Q. The figures I will correct; $26,800 was paid, actually paid to November, and then the November lease made.

"Mr. Rose: It seems to me $24,800 and $2,000 was paid on the 50 cents a ton royalty under the lease of January 25th. That is where the $26,000 comes from; there was $24,000 on the $45,000 bonus, and $2,000 on the lease at 50 cents a ton.

"Mr. Harding: You are correct."

Further on, in answer to that same question, the report says:

"'Although the payment of $45,000 appears to us as excessive, the arrangement has, on the whole, resulted in a benefit to the company.' Have you summarized anywhere, Mr. Cooper, the total amount of profit that has been made by the Presidio Mining Company out of section 5? A. The total amount of money that was made by the Presidio Mining Company out of section 5 would be the same amount that was made by section 5, with perhaps the differential deducted; in other words, the profits are divided 50 per cent. each. I think there is a computation there on page 3 of the report.

"Q. Showing the total profits, $226,231.72? A. That is operating profit taken from section 5—the total operating profit. * * * *"

In suggestion No. 11, submitted to the accountants, they were asked: What were the total bullion sales of the Presidio Mining Company from ores taken from sections 5 and 8 during the years 1913, 1914, and 1915? The answer was for each year, the totals of which were: For section 5, $502,956.10; section 8, $320,898.51.

In answer to suggestions 17 and 18, submitted to the accountants, as to the tonnage of ore taken from sections 5 and 8 during the years 1913 to 1915, the total yield of silver produced therefrom, and the average value per ton, the answer was: From section 5, tons mined, 54.7489; silver yield, $502,956.10; average value per ton, $9,187. Section 8, tons mined, 61.7468; silver yield, $320,898.51; average value per ton, $5,197. The net selling price of silver per ounce in September and October, 1912 was $0.6126, and in November and December it was $0.6110. In January and February the price commenced to drop, and fell to $0.5746. In July, 1915, it had fallen to $0.4499.

In answer to suggestions 13 and 14, submitted to the accountants, as to the total shrinkage in the income of the company, caused by the drop in the selling price of silver below 60 cents per ounce, the accountants replied that for the years 1913, 1914, and 1915 the shrinkage for sections 5 and 8 amounted to the sum of $136,948.47. Had the average selling price of silver remained at say 60 cents per ounce during the three years, this large sum of $136,948.47 would have been available in the treasury of the company for dividends, and if such a sum could have been divided with the stockholders, it is safe to say this controversy would never have arisen. The cyanide plant, completely installed by Noyes in July, 1913, saved the company from bankruptcy, in saving a larger percentage of the silver contents of the ore; but it did not entirely overcome the loss caused by the fall in the price of silver.

The previous operations of the company under the pan-amalgamating process upon ore falling from a high to a low grade of silver contents illustrates very clearly this feature of one of the difficulties in securing profitable returns from a mine of this character. It appears from the evidence that from 1888 to 1905 the Presidio Mining Company paid dividends amounting in the aggregate to $760,000, besides paying for

its plant equipment. During this period the yield of silver per ton of ore had been as high as 29.83 ounces in 1890. From this point the yield fell to 19.82 ounces in 1904. In 1905 dividends ceased. The average ore yield had been 17.95 ounces per ton. During 1906 the operating loss was $3,235.17. The plant was being operated with the pan-amalgamating process, which had been in use since 1883.

On February 16, 1907, Wm. S. Noyes, the superintendent of the mine, made a report to John F. Boyd, the president of the company, upon the then condition of the mine and its future prospects. He reported that the yield of silver from the ore of the mine had fallen to about 16 ounces per ton. It had in fact fallen to 14.62 ounces per ton for the previous year, as appears from the records. The lowest point before that was for the year 1905, when the yield was 17.95 ounces per ton. He reported that the cost of operation was entirely too high to hope for a profit from working such ore; that there had been an unprecedented advance in the price of many of their supplies and chemicals required at the mine, and that the cost of operation for the then fiscal year would undoubtedly be much higher than for the preceding year. He submitted the reports of two independent metallurgists, whose services he had secured, upon the advantages of the cyanide process over the pan-amalgamating process. They reported that the alterations in the mill necessary to install the cyanide plant would cost about $40,000; but upon the ore which the mine could then furnish, yielding on an average of 14.2 ounces per ton, the profit would be $3.05 per ton. For a conservative estimate Noyes reduced this margin of profit to $2.50 per ton. Mr. Boyd submitted this report to the stockholders for their consideration with the statement:

"If the proposed changes are made (and from the present outlook we must do that or stop work and abandon the mine), an assessment on the stock of about 10 cents per share will be necessary; therefore I request the stockholders to signify their wishes in the premises to the directors of the company."

He recommended the installation of the cyanide process in a circular letter accompanying the report. The Eastern stockholders objected. Anson Mills, the predecessor of the plaintiffs in the ownership of the stock held by them, in a letter dated July 2, 1908, stated:

"I have lost confidence in it [the Presidio mine], however, and hardly expect to receive anything further; but I want to ask you this question: Am I in any way personally responsible for future assessments, should it run into debt?"

In answer to this question Mills was informed that as a stockholder of the Presidio Mining Company he was responsible in the proportion that the stock held by him bore to the capital stock for all debts and obligations incurred by it while he was such a stockholder. In September following, Mills transferred 10,000 shares of a 15,000-share certificate to the plaintiff, W. S. Overton, 2,500 shares to the plaintiff Carl A. Martin, and 2,500 shares to Kathlein C. Kline. For the year 1907 the mine was operated at a loss, as Noyes had predicted. The loss amounted to $4,122.31.

At a meeting of the board of directors of the company on December 13, 1907, a resolution was adopted ordering and directing that the

mining and milling properties of the company "be closed immediately, and all employés discharged, and the expense of operating the same discontinued." Upon the adoption of this resolution John F. Boyd, who had been president of the company since its organization in 1883, resigned as president and director, and on the same day Boyd and his wife transferred all the stock of the corporation standing in their names amounting to 57,213½ shares to L. Osborn, the secretary of the corporation, with specific direction that Wm. S. Noyes should receive one-half of the shares, if he so desired. It is stated that the price of the stock to Osborn and Noyes was nominal. It was in fact a gift, because of the long service of both Osborn and Noyes to the company.

About this time Noyes discovered ore of a better grade in the mine, and he obtained permission from the board of directors to continue operations, and this he did, making a profit of $24,614.28 for 1908, but in 1909 the loss was $3,395.20, and for 1910 the loss was $8,140.24. In 1911 the profit was $20,881.96, and 1912 the profit was $22,919.24. But at the end of the year 1912 the grade of the ore had again fallen so low that the company faced the situation that it must put in a cyanide plant or abandon the mine. The ore exposed in the mine could not be worked by the pan-amalgamating process. Upon this situation being presented to the directors and principal stockholders, they stated, as has been previously mentioned, that they would like to see a cyanide plant installed, if it could be done without an assessment, but they were unable to pay an assessment. They suggested that Noyes should make an estimate of the cost of such a plant and see if he could not borrow the money from his friends. This he did, securing credit and borrowing money sufficient to pay for the putting in of the cyanide plant and making other improvements necessary in the mill and mine to operate both successfully. The total cost amounted to $79,359.03. This new plant was completed July 7, 1913, and finally paid for in 1916.

The tonnage of ore milled during the calendar years 1913, 1914, and 1915 (Klink, Bean & Co.'s report) was for:

| | | |
|---|---|---|
| 1913 | 21,534.4 | tons |
| 1914 | 40,375.4 | " |
| 1915 | 54,293.1 | " |
| Total | 116,202.9 | " |

The average cost of operating per ton during the years 1907 to 1912 (pan-amalgamating process) was $9.2331: "If" (says the report) "we apply against the tonnage above mentioned this average cost, it would produce an expense of $1,072,913. The sales of bullion for the same period amounted to $823,854.61. The consequent loss under these conditions for 1913, 1914, and 1915 would have been $249,058.-39." But, instead of a loss for those years, the operating profit (Klink, Bean & Co.'s report) was $145,508.26, making a difference of $394,-566.65 in favor of the operations of the plant with the cyanide process during the years 1913, 1914, and 1915 as compared with the method of operating the plant with the pan-amalgamating process from 1907 to 1912.

We have already noticed the fact, appearing in Klink, Bean & Co.'s

report, that the profit on the ore taken from section 5 by the Presidio Mining Company from January 1, 1913, to December 31, 1915, was the sum of $226,231.72. Under the terms of the lease of November 19, 1913, one half of the net value of all ore taken from section 5 was to be paid to Wm. S. Noyes as the owner of that section; the other half was to be retained by the Presidio Mining Company as its compensation for the mining and milling of the ore. The share of each party was therefore $113,115.86. During these three years Noyes was paid $63,336.20, leaving $49,553.40 due him on December 31, 1915. (It appears from the company's books that the share retained by the company was $112,889.60, instead of $113,115.86, as stated in the report of Klink, Bean & Co. The difference is immaterial to the question under consideration.) The plaintiffs point to the fact that as stockholders of the Presidio Mining Company they received no dividends from the company during these three years, while Noyes was paid $63,336.20 and claims $49,553.40 as still due him on an original expenditure by him of approximately $25,000 for the purchase of section 5.

We have here disclosed the moving cause of this whole controversy. The division was in accordance with the terms of the lease of November 19, 1913, but it appears that the share of the profits retained by the Presidio Mining Company, instead of being divided among the stockholders, was used by the company largely in making necessary improvements in the plant, improvements absolutely necessary to an economical and efficient working of the plant with the cyanide process; that these improvements accomplished all that was expected; that the average reduction in cost per ton at the mine, as shown by the Klink, Bean & Co. report, was from $10.52 per ton for the fiscal year ending June 30, 1913, with the pan-amalgamating process, to $6.21 for the 16 months ending December 31, 1914, and then to $4.53 for the calendar year ending December 31, 1915, with the cyanide process, and that without such reduction the Presidio mining plant would have had to be abandoned and the mine closed. It appears, further, that the working of the ore from section 8 was at a loss from 1913 to 1915, so that the share of the company's profits in the section 5 ore was the only profit it had, and that was all absorbed, or nearly so, by the necessary improvements in the company's plant and in making up the loss from section 8 ore.

But the plaintiffs, to meet this aspect of the case, complain that the lease of November 19, 1913, was not fair; that it provided that from the actual cost of mining and milling section 5 ore there should be deducted the sum of $1 per ton for the small cost of mining and milling such ore as compared with the milling and mining of section 8 ore. It is charged that this differential was worked to the disadvantage of section 8. It was voluntarily discontinued by Noyes in August, 1914. It had not been in operation for nearly a year when this suit was commenced. Whether during the time it was in operation it worked to the disadvantage of section 8 is not clear. The weight of evidence is apparently the other way, but in any point of view it was insufficient to establish the differential as part of an alleged fraudulent scheme on

the part of Noyes to defraud the stockholders of the Presidio Mining Company.

The plaintiffs also complain that the method provided by the lease of November 19, 1913, for delivering the net value of the ores from sections 5 and 8 for apportionment of bullion as between the two sections was unfair and unjust to section 8, and was part of the scheme to defraud the stockholders of the Presidio Mining Company. This was the first question submitted to the official accountants by the court's direction. The direction was that the accountants should make an—

"examination of original sources of information relative to tonnage of ores mined, and assay values thereof, from which apportionment of bullion yield is ascertained, with costs of operation apportioned to both production from section 8 and section 5.

"(a) Investigate the figures as to record of tonnage produced from different faces of ore from the same stope, with assay values from corresponding faces, in connection with forms 10 and 11.

"(b) Examination as to accuracy of system by which bullion apportionment is figured, both as to section 8 and section 5."

To this direction the accountants made reply:

"There is no record of the tonnage produced from the different faces of ore from the same stope to apply against the assay values from the corresponding faces. The system by which the bullion apportionment is figured as between section 8 and section 5 is not accurate. Under the existing conditions, however, it is as nearly so as can be made. In this connection, we submit the following conclusions and comments, based upon observations of existing conditions and from information elicited at the property:

"That the sampling is carried out in a systematic and practical manner and conforms to the terms of the contract.

"That the tonnage estimates from No. 5 are being kept in the usual mine fashion, where no weighing apparatus exists.

"The sampling for both mines is done in the same manner and method, and the adjustments made to both properties according to the mine assay percentage. Over a long period the law of averages should tend to equalize the results.

"To change these methods for the purpose of obtaining more accurate results of assays, weights, and reconciling, it would be necessary to adopt either of the following plans:

"(1) To maintain an engineering and sampling force at a cost of $5,000 to $6,000 per year, and increase the cost of mining by reason of separate handling.

"(2) The building of an automatic sampling and weighing plant at an approximate cost of $25,000."

Then follows a statement of the method adopted by the accountants to correct the mine assays, where they appeared to be abnormally high as compared with general averages. The result showed that the method of apportionment used was slightly in favor of section 8, and not to its disadvantage, as charged by the plaintiffs. The oral examination of Mr. Klink and Mr. Cooper, the accountants, upon this feature of their report, confirms its correctness, and establishes the fact that the sampling of the ores from the two mines had been carried out in a systematic and practical manner and conformed to the terms of the contract; that the sampling for both mines had been done in the same manner, and the adjustment made to both properties according to the

mine assay percentage; and that over a long period the law of averages should tend to equalize results.

In further answer to questions submitted to the accountants, they make the following replies:

"The terms of the contract of November 19, 1913, between William S. Noyes and the Presidio Mining Company, have, in our opinion, been fairly carried out.

"The books of the Presidio Mining Company at the present time are being properly kept and transactions correctly recorded. This was not wholly true of the San Francisco office during the incumbency of Mr. Osborn. The company prepares elaborate tables, showing details of its mining and milling operations. These details are sufficiently clear for the information of all concerned. We might possibly add thereto a more extended form of annual report showing the financial results for each year.

"No separate records are kept as to mining and milling ore from sections 8 and 5, although separate mine assay records are kept for each section.

"The methods used for estimating tonnage are in accord with mining practice at small mines. The sampling is done in a systematic and practical manner, and conforms to the terms of the contract. The assaying apparatus is good, and the assaying is conducted in a regular, competent, and systematic manner."

It is next contended that the acquisition of the control of the Presidio Mining Company by the defendants was by means of a fraudulent manipulation of the Osborn stock. This charge is also denied by all the defendants under oath.

In November, 1907, John F. Boyd, the president of the company, held 36,966⅔ shares of the stock of the company in his own name and 20,265⅔ shares as trustee for his wife, Louise A. Boyd. W. S. Noyes had 1,382 shares, and L. Osborn 20 shares. In the previous February Noyes, as superintendent of the mine, had reported that the ore then exposed in the mine could not be worked profitably with the pan-amalgamating process. The installation of the cyanide process, with which the ores could be worked properly would involve an assessment upon the stock. The stockholders objected; the objection coming mainly from Anson Mills, owning 17,000 shares, and the predecessor in interest in the stock held by the plaintiffs. The board of directors directed the closing of the mining and milling properties of the company and the discharge of all employés. Boyd immediately resigned as president and director, and thereupon he and his wife transferred their stock to Osborn, with direction to transfer one-half to Wm. S. Noyes, if he so desired.

The mine had paid dividends for 21 years in an amount more than five times the equivalent of the par value of the capital stock of the company. Boyd and his wife had been large shareholders, and had participated in the dividends. But the mine had reached the point where the high grade of silver contents appeared to have been exhausted. Noyes had been the superintendent of the mine ever since it was opened in 1883. Osborn had been the secretary since 1887. Both had been identified with the activities of the corporation during the days of the prosperity. Boyd was not a well man, and had been advised by his physician to retire from active business. When the stockholders determined not to levy an assessment to secure the funds for the installation of the cyanide plant, Boyd at once withdrew the entire interest

of himself and wife from the company, and transferred his stock to Osborn, but with the direction that Noyes should have one-half, if he so desired. Osborn, in San Francisco, notified Noyes at the mine in Texas by letter of the transfer of the Boyd stock, and the direction of Boyd as to the one-half of such stock for Noyes.

When Noyes came to San Francisco, both Boyd and Osborn notified him of the conditions, and Noyes said he would be glad to accept the stock, but wished it to remain on the books of the corporation in the name of Osborn. At the annual meeting of the stockholders of the company, held October 15, 1908, Osborn held 57,223⅓ shares of the stock of the company and Wm. S. Noyes 1,382 shares. This stock remained on the books of the company in their names until December 13, 1912, when Noyes notified Osborn that, if any responsibility were to arise by reason of the ownership of his share of the Boyd stock, he was prepared to assume it and requested the transfer to him of that stock. Osborn accordingly on December 12, 1912, transferred to Wm. S. Noyes 28.607 shares of the Boyd stock in accordance with Boyd's direction. In other words, Noyes placed in the records of the corporation the usual evidence of his rightful, legal ownership of that stock. Noyes left San Francisco for the mine four days later, and he testified that on January 19th or 20th he first learned of the Osborn shortage by a telegram from his brother, B. S. Noyes, in San Francisco.

The plaintiffs claim that Noyes knew of this shortage before he left for the mine, and that he obtained the transfer of the stock from Osborn to himself under a threat to expose Osborn and bring him and his family to disgrace. Aside from the absurdity of charging Noyes with extortion in securing the legal title to his own property, there is no evidence to support even the color of coercion in the transfer. But the plaintiffs seek to draw such an inference from a remote and wholly irrelevant circumstance. It appears that one J. W. Kniffin was employed by Noyes to install the cyanide plant for the Presidio Mining Company. He went to the mine for that purpose about December 23, 1912. He testified that he was informed of the Osborn shortage some time in the early part of January, 1913; that he was told by either Gleim or Burcham. Gleim was the superintendent of the mine; Burcham's relation to Noyes, or the mine, we do not know. Kniffen testified that he was ready to proceed with the construction of the cyanide plant, when Gleim told him that money they had thought they had had been taken from the treasury, and they did not have it; that on the 19th of January Gleim gave orders to start the work, and the witness commenced work on the 20th.

On cross-examination the witness did not mention the Osborn shortage as the cause of the delay in going ahead with the cyanide plant, or that Gleim said anything about money having been taken from the treasury of the company; but he testified that Gleim had told·him some time toward the 1st of the month that there would have to be a suspension of the work of some kind, because they did not have the money. He was asked to fix the time when Gleim made that statement to him, and he finally did fix it as on January 13, 1913. The statement made at that time was perfectly true, for Noyes did not then

have sufficient money and credit to go on with the work. When these were subsequently secured, Kniffen was ordered to proceed with the work. When, more than four years later, Kniffen was called upon to testify to this incident, he may, on the direct examination, have momentarily confused the knowledge of the Osborn shortage with the knowledge of a lack of funds to go on with the cyanide plant, a confusion which he in effect corrected on cross-examination by fixing the date of the Gleim statement as on January 13th, and that it related simply to a lack of money to go on with the work; that is to say, the money, which had to be borrowed or credit secured, had not then been obtained.

This testimony is plainly not a contradiction of Noyes' testimony that he first heard of the Osborn shortage on January 19th. Furthermore, the delay in going on with the work of installing the cyanide plant could not have been on account of the Osborn shortage, since that work was proceeded with on January 19th or 20th, and after Noyes had obtained money and credit for that purpose, but before the Osborn shortage had been made good. The Osborn shortage was not made good until the last days of February, when the work on the cyanide plant had been going on for more than a month. If the delay had been on account of that shortage, the work could not have commenced before the last days of February, instead of the 19th or 20th of January. This uncontradicted fact alone appears to be sufficient to establish the truth of Noyes' testimony. But, in any point of view, the burden of proof rests on the plaintiffs to prove their charge clearly and distinctly, and overcome the direct and positive testimony of B. S. Noyes and Laura M. Doherty, confirming and corroborating the testimony of Wm. S. Noyes upon this question.

Plaintiffs also charge that Noyes extorted from Osborn the stock he held in his own right, which he was requested to transfer and did transfer as security for the money loaned him to make good his shortage. There is no evidence or inference to support this charge, and we know of no law that makes such an act extortion.

In all of these transactions we find no evidence of fraud, or of unfair or inequitable conduct, on the part of Wm. S. Noyes in his dealings with the Presidio Mining Company, or any of its stockholders, and no assertion of a dominant sinister power or influence over the board of directors or any of the stockholders. The lease of January 25, 1913, was adopted by the board of directors of the company at a meeting of the board held on January 29, 1913. Wm. S. Noyes was not present at the meeting. He was elected a director at a meeting of the board held on January 31, 1913. On that date he was in Texas, and had been there since shortly after the middle of December, 1912, and he remained there until February 5 or 10, 1913. He was present when the so-called "bonus resolution" was passed on February 15, 1913, but he took no part in the proceedings. He was not present when the lease of November 19, 1913, was approved and signed. Upon the face of the record, and in view of all the evidence, we are of the opinion that the lease of January 25, 1913, the resolution of Feb-

ruary 15, 1913, and the lease of November 19, 1913, were all legal, just, and equitable in their terms, and for a valuable consideration.

Judge Dooling, in his opinion, referred to the charge in the original bill that the officers of the company had been paid extravagant salaries; but he evidently did not consider that alone sufficient ground for equitable relief, for he denied the application for a receiver and for an injunction pendente lite, and granted the motion to dismiss the bill, with leave to file an amended bill, notwithstanding the charge was fully stated in the original complaint.

[4] Plaintiffs charge in their amended bill of complaint that the salaries paid to the directors and San Francisco officers of the Presidio Mining Company were exorbitant, excessive, and wholly out of proportion to the services performed; that Wm. S. Noyes had caused at all times subsequent to December, 1912, and at the time of the filing of the complaint was causing, the said salaries to be paid, and had agreed that said salaries should continue to be paid to said directors and officers in consideration for their acting as dummy directors, and assisting in and complying with and becoming parties to his plans for defrauding and mulcting said company, and directing to his own use and profit moneys and property legally and equitably belonging to the company; that the salaries so paid to the defendants as directors and officers were part of the consideration with which Noyes procured their assistance to and approval of the fraudulent, unfair, and inequitable leases, agreements, resolutions, and motions recited and referred to in the complaint. This charge is also denied by all the defendants under oath.

We have already discussed their alleged fraudulent acts in connection with the leases, agreements, resolutions, and motions set forth in the complaint, and we have found that the charge has not been sustained by evidence. It remains only to notice the charge and the finding of the interlocutory decree that the salaries of the directors and officers in San Francisco, and in the increases thereof and payments made thereunder from the treasury of the company to said defendants as directors and officers of the corporation, and all acts, resolutions, and proceedings relative thereto, are each and every and all illegal and fraudulent.

The salary of John F. Boyd as president of the company had been $200 per month for 15 years prior to his resignation in December, 1907. John W. F. Peat was then elected president at the nominal salary of $25 per month. This salary was continued, although not always paid, until January, 1913. Then B. S. Noyes became president, and his salary was fixed at $150 per month, which was continued until November, 1914, when in common with other officers and employés of the company salaries were voluntarily reduced on account of the depreciation in the value of silver. When B. S. Noyes became president, Peat was made assistant secretary at $25 per month. B. S. Noyes' salary was reduced in November to $125 per month. Wm. S. Noyes was appointed superintendent of the mining and milling operations of the company in 1883. His salary for the first year was $300 per month. It was then raised to $450 per month, and had been continued at that

rate until November, 1914, when his salary was reduced to $375 per month.

The salary of the secretary had always been $300 per month until November, 1914, when it was reduced to $270 per month. The salary of E. M. Gleim, who has been superintendent of the mine since February, 1913, has been $450 per month. His first employment appears to have been in 1909 at $90 per month. His salary was increased to $125 per month, and then to $250 per month; the increases corresponding to the increase in his duties and responsibilities. The last is the only increase of salary disclosed in the record; but as Gleim is employed at the mine, is not a defendant, or a director or officer in San Francisco, the charge does not apply to him.

The burden of proof was upon the plaintiffs to prove the illegal and fraudulent character of the salaries paid to the directors and officers in San Francisco. The presumption is that salaries paid for so many years to these officers prior to November, 1914, without protest or objection on the part of the minority or other stockholders, were reasonable and just, and the reduction of these salaries in November, 1914, eight months before the commencement of this suit, was clearly evidence of a just regard for the interest of the company and its stockholders, and is directly in contradiction of plaintiffs' claim, and the finding of the interlocutory decree, that the salaries were all illegal and fraudulent.

Counsel for plaintiffs in their brief virtually reduce this charge to a query. They say:

"We fail to see where it was necessary to have a general manager in San Francisco at $450 per month, and likewise a second executive in the person of a president, drawing a large salary of $150 per month, when the company was alleged to have had an efficient and able superintendent at the mine. We may likewise fail to see where it was necessary for Peat, a former dummy president, to have created for him the office of assistant secretary at $25 a month, when the embezzler, Osborn, was continued at a monthly salary of $300 for services worth not over $75 a month."

Leaving out the epithets, there is but little substance to the query; but, as the burden of proof to show that such salaries were not necessary and were fraudulent in purpose was upon the plaintiffs, we cannot uphold the interlocutory decree, declaring them fraudulent, without such proof. That there is no such proof in the record is practically conceded by the decree itself in a subsequent provision "requiring the defendants," reversing the established order of proof, "to present evidence before the master, if any they have, to show that said salaries or increases thereof were and are reasonable and fair." Then, when the defendants have presented this evidence, the master is "also to take evidence on behalf of complainants, wherein said salaries or increases thereof were and are unreasonable or unfair; that said master also take and report like evidence in regard to the salary of E. M. Gleim, and any increase thereof."

The defendants had already produced evidence that the salaries were reasonable and just, partly by direct testimony, and partly by evidence of a continuance of salaries for a number of years, without protest or objection on the part of the minority or other stockholders, and by

evidence of a reduction of salaries prior to the commencement of this action, to meet the depreciation in the price of silver. This evidence was not contradicted, and certainly no inference of fraud or injustice can be drawn from this state of the evidence, which tends to show that the salaries were at all times just and reasonable.

There are a number of other minor charges against the defendants, which we do not think of sufficient importance to review. We have, however, examined the evidence relating to them, and we find them not proven.

[5] We now recur to the question of law, whether the conduct of Wm. S. Noyes, either prior or subsequent to January 31, 1913, was such as to render him chargeable with a constructive trust in his dealings with the company, and particularly with respect to the purchase of section 5. For the purpose of this inquiry we accept Bispham's definition of a constructive trust, cited by plaintiffs:

"* * * Certain kinds of constructive trusts are based upon fraud; in other words, equity considers that, in consequence of certain fraudulent conduct, the relationship of trustee and cestui que trust is called into being, and the rights of the parties are determined upon the footing of that relation. The ground of relief, therefore, is both fraud and trust."

We also accept plaintiffs' citation from Taylor v. Taylor, 49 U. S. (8 How.) 183, 199, 12 L. Ed. 1040, wherein Mr. Justice Daniel quotes from Story's Equity Jurisprudence as follows:

"If confidence is reposed, it must be faithfully acted upon, and preserved from any intermixture of imposition. If influence is acquired, it must be kept free from the taint of selfish interests, and cunning, and overreaching bargains. If the means of personal control are given, they must be always restrained to purposes of good faith and personal good. Courts of equity will not, therefore, arrest or set aside an act or contract, merely because a man of more honor would not have entered into it. There must be some relation between the parties which compels the one to make a full discovery to the other, or to abstain from all selfish projects. But, when such a relation does exist, courts of equity, acting upon this superinduced ground, in aid of general morals, will not suffer one party, standing in a situation of which he can avail himself against the other, to derive advantage from that circumstance."

Indeed, we might say generally that the authorities cited by plaintiffs in their brief may be accepted as stating correct principles of equity, but they are not all applicable to the facts in this case.

In Cowell v. McMillen, 177 Fed. 25, 100 C. C. A. 443, this court was called upon to consider the facts in a controversy very similar to the facts in this case. Many of the questions involved in that case are present here, and among other things it was held that a director of a corporation is not precluded from making a contract with the corporation in which he is personally interested, where he has acted with that candor and fairness which equity requires in dealings between him and the corporation, and the transaction is open and fair. To the same effect are Barr v. Pittsburg Plate Glass Co. (C. C.) 51 Fed. 33; Id., 57 Fed. 86, 6 C. C. A. 260.

In the late case of Du Pont v. Du Pont, 256 Fed. 129, in the Circuit Court of Appeals for the Third Circuit, it was held that a court of equity is not warranted in interfering with the management and policy

of a corporation, as determined by a majority of its stockholders, unless it clearly appears that their action was not taken in good faith, in the interest of all its stockholders.

Assuming, now, as alleged in the amended bill of complaint, that Wm. S. Noyes was the dominant force with the majority stockholders of the corporation, and that his conduct was the conduct of the majority; wherein does it appear that he has not acted in good faith with respect to the purchase of section 5? When did he fail to make a full, fair, and truthful discovery to the corporation and its stockholders of the advantage that would accrue to the corporation in the purchase of that section? And when at the time of its purchase by Noyes because it was beyond the financial reach of the corporation, did he fail to notify the corporation and its stockholders that the property was still open to purchase by the corporation at the cost it had been to him? It is true he does say distinctly and positively and under oath that he does not hold the title fraudulently and unfairly or unjustly to the rights of the corporation, and he does say that he is not liable to the charge of discreditable, illegal, and fraudulent conduct with respect to that title, or to suffer the penalties and consequences attending upon a fraudulently, acquired title. What is the evidence we find in the record upon the question?

E. M. Gleim, the superintendent of the Presidio mine, testified concerning the first move to acquire title to section 5:

"It was about the middle of December when I met Mr. Noyes at Marfa. I do not remember now the exact date. On his arrival I gave him my opinion as to section 5, and what had been done by the Lewisohn Bros. on the Silver Hill mine, and told him it was my opinion that we ought to get the property, if possible, some way. By 'we' I mean Mr. Noyes and myself as representatives of the Presidio Mining Company. After I had told him this, the first thing we did was to see if it was possible to arrange for any money with which to obtain the section. We went first to Mr. Wm. H. Cleveland, who was a personal friend of Mr. Noyes, and asked Mr. Cleveland if he could loan $10,000. Mr. Cleveland said he could not, but he thought we might arrange it at the Marfa National Bank, with which Mr. Cleveland was connected at that time as a stockholder and director. We went to the bank subsequently, and the cashier, Mr. Fennell, told us we could get the money, $10,000; that Mr. Noyes could get the money."

The money was obtained January 17, 1913. Mr. Cleveland was a witness for the defendants in this case, and testified that he made arrangements for Mr. Noyes to get the money from the bank; that the witness went on his note as security. He testified, further, that in 1912 and the early part of 1913 he would not have loaned the Presidio Mining Company any money without additional security. On January 23, 1913, Wm. S. Noyes wrote from El Paso, Tex., to Mrs. Willis, in San Francisco. Mrs. Willis was then the holder of 36,000 shares of the Presidio Mining Company's stock. Mr. Noyes writes, among other things, as follows:

"I have borrowed the money and got control of section 5—to add to the Presidio later on."

Mr. Noyes testified, concerning his discussions with the stockholders and directors of the Presidio Mining Company in regard to the purchase of section 5, as follows:

"In the latter part of 1912 there was a discussion between myself and the stockholders and directors of the company in regard to the purchase of section 5. * * * The discussions were with Mrs. Willis, Miss Doherty, and Mr. Osborn. * * * I told Mr. Osborn that, if it came on the market, that I would like to get it to help out the Presidio. I told Mrs. Willis the same thing, and Miss Doherty."

After the purchase, and the discovery of the Osborn shortage, he said:

"After my return here to San Francisco, I went to see Mrs. Willis and Miss Doherty at Mrs. Willis' apartments, and told her there was this shortage, and it left me in a bad scrape, and the company in a worse one; that I had bought this section 5 with money that I had borrowed. The company had then contracts which I had assured my friends were good; and the company could have that mine at cost, if they wanted it; * * * that the company could take the mine at any time they were able to, off my hands at its cost."

Mr. Noyes was asked this question:

"In regard to the conditions under which you entered into the agreement with the company in the manner that you have described, to divide the net profits fifty-fifty, was there any statement or promise made by you that the company might at any time buy section 5, when it was in a financial position to do so, or wished to do so, or could do so?"

Mr. Noyes' answer was:

"I told them that many times in conversation; that was a part of the conversation that took place when the agreement was made, between Mrs. Willis, Miss Doherty, and Mr. Osborn."

Mr. Noyes was asked on cross-examination if he ever offered section 5 to the company in any formal resolution, to which he replied:

"Well, I offered it— I don't quite understand what you mean by formally offering it to the company. It was put up to them for action at a meeting as an organized body on November 19, 1913, and I am under the impression it was offered, also. In February, when that resolution was passed. It was rather a colloquial offer. They were simply told it was open to the company, if they wanted to take it. The company took no action—that is to say, the company could not do it; it had no money. In November the minutes recite that it had been offered to them; it was offered verbally at that meeting."

Miss Doherty testified:

"Mr. Noyes spoke about this section 5 being on the market, and that he would like to get it for the company. * * * Mrs. Willis said she did not see how they could buy anything that way and assume this large debt of installing the cyanide plant. Mr. Noyes said, well, that he would get that, and they could take it over afterwards. He said, whenever the company was able to take it for what he paid for it, why the company could have it, if they wanted to."

The witness was asked whether, at any of the meetings with Mr. Noyes, anything was said as to the terms upon which the company could obtain section 5. Her reply was:

"I think he said, 'Pay him what he had paid for it.' They could buy it from him whenever they wanted it, or words to that effect."

B. S. Noyes, the president of the Presidio Mining Company, testified concerning the meeting of the board of directors on February 15, 1913, that there was a discussion as to what disposition would be made of section 5, which Mr. Wm. S. Noyes had bought. The witness said:

"Mr. Noyes stated that the company could have section 5 at cost, then or thereafter; and it was informally decided prior to the date of that meeting that the company could not take it, and the suggestion had been made and assented to by all parties that, as Mr. Noyes carried it, the company could take the ore and settle with him on the basis of one-half of the net."

In the report to the board of directors of the corporation by Wm. S. Noyes as vice president and general manager, dated October 6, 1913, he said:

"Early in 1913 section 5, adjoining the Presidio mine, was on the market for sale. This company being unable to buy it, having exhausted its credit on the new installation before mentioned [cyanide plant and tramway], it was purchased by the writer, and an agreement made whereby this company will work it on terms of a division of the net, and perhaps will purchase the same later on. Late developments in section 5 indicate that it will be a source of large revenue."

A copy of this report was sent to all the stockholders of the company, including the plaintiffs. In a report to the stockholders of the company by Wm. S. Noyes as vice president and general manager, dated February 28, 1916, he says:

"The contract to buy ore from section 5 has been a source of good profit to the company, though, of course, much less than it might have been, but for the poor conditions in the silver market. Since it has been in force, January, 1913, to and including December 31, 1915, 54,748.45 tons have been delivered under the contract, and this company has received $112,889.60, or $2.06 per ton, as its half of the net proceeds. The writer has received $63,336.20 on account of his half of the net, and the remainder due him, $49,553.40, on account of the same net. These sums aggregate $112,889.60, which amount equals the sum actually received by the company, and corresponds to a royalty of $2.06 per ton of ore delivered. During the first 10 months of the year, the market for silver was greatly depressed, reaching the record low price in August; but still we made a profit. It may be of interest to our stockholders to know that for the three years, 1913, 1914, and 1915, the shrinkage in the price of silver below the figure assumed in the calculations for the cyanide plant (which figure seemed conservative at the time) amounted to $155,000 for the silver produced at the mill during that time. But for this last-mentioned decline in the market price for silver the company [Presidio Mining Company] would long ago have acquired section 5, as was originally contemplated in 1913. Provided the market remains at its present level, we should be prosperous during the coming year."

It is clear from this evidence that Noyes purchased section 5 with his own money, but for the benefit of the Presidio Mining Company; that he has always been ready to convey it to the company upon the payment to him of its purchase price, and as late as February 28, 1916, in his last report to the stockholders, he declared in effect that he held the title for that purpose and no other; from all of which it appears that the solution of this controversy obviously lies very near the surface and is found in the terms of the lease of November 19, 1913. It is there provided:

"It is further agreed that this lease shall terminate on 30 days' notice given in writing from either party to the other party to the contract."

It is a curious fact that the question whether this lease was or was not a fair and judicious contract for the board of directors to make was submitted to the accountants, Klink, Bean & Co., who answered in

four lines with practical good judgment the essential question at issue in the case as follows:

"Assuming that the company could not avail itself of the opportunity to acquire the property now known as section 5, the contract of November 19, 1913, was fair enough. Should its operation have proven unprofitable, it could have been terminated on 30 days' notice."

That the company was not in a financial position to avail itself of this provision of the lease during the years 1913, 1914, and 1915, was because of the decline in the price of silver and the expense the company was compelled to incur in the installation of the cyanide process and in making other necessary improvements for the efficient and economical working of the plant. That the company was in a position, however, to avail itself of the opportunity to acquire this property by purchase on the 16th of February, 1918, if not before, is established by the order of the interlocutory decree of that date, directing that it should be purchased, and purchased at the price for which Noyes had always held it for the company.

The only remaining element in the case is the direction of the decree that Wm. S. Noyes shall convey section 5 to the Presidio Mining Company upon the payment to him of the purchase price, with interest, assessments, etc. As this conveyance will terminate the lease, both should be fixed for the same day, namely, as of the date of the interlocutory decree, February 16, 1918.

We have been requested by both parties to this action to consider the case on the merits and direct a final decree accordingly. This we think we may do on the pleadings as they stand and the evidence that has been taken upon the issues. The case appears to be here in all necessary detail and in condition upon the evidence material to such issues for such a decree, and such will be the order of this court.

That part of the interlocutory decree providing "that in and by said final decree the said William S. Noyes shall be ordered and directed within 30 days from the date thereof to transfer said section 5 to said Presidio Mining Company by proper deed free and clear of all liens and incumbrances" will stand affirmed.

That part of the decree relating to the payment of the purchase price of the property to William S. Noyes, providing, "that said William S. Noyes be credited with the purchase price of section 5, together with interest thereon at the rate of 7 per cent. per annum from January 25, 1913, and also any sums which may be found to have been paid by said William S. Noyes for the use and benefit of said Presidio Mining Company, together with interest on said sums at the rate of 7 per cent. per annum from the date of payments," will stand affirmed.

That part of the decree will run against the Presidio Mining Company and its officers and directors, and will be as of the date of February 16, 1918; the amount due thereon to be ascertained by a reference to the accountants, Klink, Bean & Co.

The final decree will also provide for the payment to William S. Noyes of the amount due him under the lease of November 19, 1913, from January 25, 1913, to February 16, 1918; the amount to be ascertained by a reference to the accountants, Klink, Bean & Co., with di-

rection to extend and complete their schedules as they appear in the record and are there numbered 4, 5, 6, 7, 8, and 9, so as to include in like manner, but in a condensed form, all royalties due and payable to William S. Noyes for the years 1916, 1917, and down to February 16, 1918.

In this computation Wm. S. Noyes will be charged with $3,500, which we find was in effect paid to him on September 6, 1913, and was applied by his direction to make good a further shortage in the accounts of L. Osborn. This amount is included in the statement made by Noyes that up to December 31, 1915, he had received $63,336.20. To the amount thus found due William S. Noyes under the lease of November 19, 1913, will be added the amount found due him on the purchase price of section 5, and for the full sum so found due him the final decree will run against the Presidio Mining Company, its officers, and directors.

The interlocutory decree in all other respects not herein mentioned will be reversed and set aside, the interlocutory injunction dissolved, and the receiver discharged. The plaintiffs and defendants will each pay their own costs in this court.